1  Robert Jay Moore (#77495)
   Thomas R. Kreller (#161922)
2  David B. Zolkin (#155410)
   Haig M. Maghakian (#221954)
3  MILBANK, TWEED, HADLEY & McCLOY LLP
   601 South Figueroa Street, 30th Floor
4  Los Angeles, California 90017
   Telephone: (213) 892-4000
5  Facsimile: (213) 629-5063

6  Attorneys for American Restaurant Group, Inc., et al.
   Debtors and Debtors in Possession
7

8

9          UNITED STATES BANKRUPTCY COURT

10          CENTRAL DISTRICT OF CALIFORNIA

11              LOS ANGELES DIVISION

12  | In re | ) | Case Nos.  LA 04-30732 TD |
    |       | ) |            LA 04-30734 TD |
13  | **AMERICAN RESTAURANT** | ) |  LA 04-30736 TD |
    | **GROUP, INC.**, a Delaware corporation; | ) | |
14  | **ARG ENTERPRISES, INC.**, a | ) | Jointly Administered Under |
    | California corporation; **ARG** | ) | Case No. LA 04-30732 TD |
15  | **PROPERTY MANAGEMENT** | ) | |
    | **CORPORATION**, a California | ) | Chapter 11 Cases |
16  | corporation. | ) | |
    |  | ) | **DEBTORS' APPLICATION TO EMPLOY** |
17  | (commonly known as "**Stuart** | ) | **HOULIHAN LOKEY HOWARD &** |
    | **Anderson's Black Angus Restaurants**" | ) | **ZUKIN CAPITAL PURSUANT TO** |
18  | or "**Stuart Anderson's Cattle** | ) | **BANKRUPTCY CODE SECTIONS 327(a),** |
    | **Company Restaurant**") | ) | **328(a) AND 330(a); DECLARATION OF** |
19  | | ) | **THOMAS R. KRELLER IN SUPPORT** |
    | Debtors and Debtors-in-Possession. | ) | **THEREOF** |
20  | | ) | |
    | | ) | |
21  | Affects all three Debtors:  X | ) | [Expedited Hearing Requested] |
    | | ) | |
22  | Affects only: | ) | |
    | | ) | |
23  | American Restaurant Group Inc. ___ | ) | |
    | | ) | |
24  | ARG Enterprises Inc. ___ | ) | |
    | | ) | |
25  | ARG Property Management Corp. ___ | ) | |

26

27

28

LA1:#6292375v1

1  **TO THE HONORABLE THOMAS B. DONOVAN, UNITED STATES BANKRUPTCY**
   **JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, COUNSEL TO THE**
2  **OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND OTHER PARTIES IN**
   **INTEREST:**
3

4              American Restaurant Group, Inc. ("ARG"), ARG Enterprises, Inc. ("Enterprises"),

5  and ARG Property Management Corporation ("APM"), debtors and debtors-in-possession in the

6  above-captioned cases (collectively, the "Debtors"), hereby submit this application (the

7  "Application") for entry of an order authorizing the retention and employment of Houlihan Lokey

8  Howard & Zukin Capital ("Houlihan") for the purposes of providing financial advisory and

9  investment banking services in these chapter 11 cases, effective as of the Petition Date (as defined

10 below), pursuant to sections 327, 328 and 330 of title 11 of the United States Code (the

11 "Bankruptcy Code"), Rules 2014(a) of the Federal Rules of Bankruptcy Procedure (the

12 "Bankruptcy Rules") and Rule 2014-1 of the Local Bankruptcy Rules for the Central District of

13 California (the "Local Rules").  Subject to the modifications and clarifications described herein,

14 the terms of Houlihan's proposed retention are set forth in the engagement letter dated July 29,

15 2004, between the Debtors and Houlihan (the "Engagement Letter"), a true and correct copy of

16 which is included in Exhibit 1 to the Declaration of Thomas R. Kreller filed in support hereof (the

17 "Kreller Declaration") and incorporated herein by this reference.

18                                   **BACKGROUND**

19             On September 28, 2004 (the "Petition Date"), the Debtors filed with this Court

20 voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

21 §§ 101-1330 (the "Bankruptcy Code").  The Debtors continue to operate their business and

22 manage their assets as debtors-in-possession, pursuant to Bankruptcy Code sections 1107(a) and

23 1108.  No trustee, examiner or statutory committee of creditors has been appointed in this case.

24             On October 5, 2004, the Debtors filed an application (the "Original Application")

25 to employ Houlihan to provide the Debtors with financial advisory and investment banking

26 services on the terms set forth in the Engagement Letter.  A true and correct copy of the Original

27 Application is attached to the Kreller Declaration as Exhibit "2".  Among other things, the

28

1  Original Application sought Court approval of the Engagement Letter pursuant to the provisions

2  contained in Bankruptcy Code Section 328(a).

3  The Original Application was objected to on a number of grounds by the Office of

4  the United States Trustee (the "UST") and the Official Committee of Unsecured Creditors (the

5  "Committee"). The Debtors attempted to address many of those concerns by filing a

6  supplemental memorandum and declarations in support of the Original Application on October

7  27, 2004 (the "Supplemental Memo"). A true and correct copy of the Supplemental Memo is

8  attached to the Kreller Declaration as Exhibit "3".

9  The Court conducted a hearing on the Original Application on November 1, 2004.

10 At that hearing, the Court denied the Original Application, finding, among other things, that the

11 Debtors had not established that the proposed terms of the Engagement Letter satisfied the

12 "reasonableness" requirement contained in Bankruptcy Code Section 328(a). The Court did

13 indicate, however, that the denial of the Original Application was without prejudice to the

14 Debtors' ability to seek approval to employ Houlihan on other terms. As set forth in detail below,

15 the Debtors and Houlihan have agreed to modify the relief requested in the Original Application

16 in several respects and, on that basis, now seek to have the Court approve Houlihan's

17 employment on the terms described in this Application.

18                              . **HOULIHAN AND ITS SERVICES**

19 The Debtors require the services of an experienced financial advisor to assist and

20 advise them in these chapter 11 cases. Houlihan is a nationally recognized investment

21 banking/financial advisory firm with 9 offices and more than 400 professionals worldwide.

22 Houlihan provides financial advisory services and execution capabilities in a variety of areas,

23 including financial restructuring, where Houlihan is one of the leading advisors and investment

24 bankers to debtors, bondholder groups, secured and unsecured creditors, acquirors, and other

25 parties in interest involved in financially troubled companies, both in and outside of bankruptcy.

26 Houlihan's Financial Restructuring Group has over 100 professionals dedicated to financial

27 restructuring engagements.

28

The Engagement Letter is attached as an exhibit to the Declaration of Peter Fishman (the "Fishman Declaration") that was filed in support of the Original Application. A true and correct copy of the Fishman Declaration is attached to the Kreller Declaration as Exhibit "1" and is incorporated herein. As set forth in the Engagement Letter, the scope of Houlihan's retention includes:

    a. assisting the Debtors in the development, preparation and distribution of selected information, documents and other materials necessary for the creation of interest in, and subsequent consummation of, any Transaction(s) (as defined in the Engagement Letter as a Restructuring, Financing or Sale Transaction); solicit and evaluate indications of interest and proposals regarding any Transaction(s); assisting the Debtors with the development, structuring, negotiation and implementation of any Transaction(s), including, among other things, participation, as a representative of the Debtors, in negotiations with creditors and other parties involved in any Transaction(s);

    b. assisting the Debtors in valuing the Company and/or, as appropriate, valuing the Debtors' assets or operations; provided that any real estate or fixed asset appraisals will be undertaken by outside appraisers, separately retained and compensated by the Debtors;

    c. providing expert advice and testimony regarding financial matters related to any Transaction(s), including, among other things, the feasibility of any Transaction, and the valuation of any securities issued in connection with any Transaction;

    d. advising the Debtors regarding the availability of new debt and/or equity financing, mergers or acquisitions, and/or the sale or other disposition of any of the Debtors' assets or businesses;

    e. as requested by the Debtors, developing a list of potential lenders, equity investors, and/or strategic partners (collectively, "Investors"), and interact with such Investors in an effort to create interest in Transaction(s) with the Debtors;

    f. as requested by the Debtors, assisting the Debtors in the preparation of an appropriate offering memorandum to provide to Investors interested in Transaction(s) with the Debtors, and submit and discuss such offering memorandum with interested parties, and participate, as a representative of the Debtors, in the negotiation of Transaction(s) with interested parties;

    g. assisting the Company with due-diligence investigations conducted in connection with any Transaction(s);

    h. providing testimony in connection with the foregoing, if necessary; and

    i. rendering, during the term of the Engagement Letter, such additional financial advisory and investment banking services, the identity and compensation for which shall be mutually agreed upon by Houlihan and the Debtors.

1    Since its retention pursuant to the Engagement Letter (both prior and subsequent to

2    the Petition Date), Houlihan has been instrumental in assisting the Debtors, and their management

3    and board, on numerous matters, including reviewing and analyzing the Debtors' business,

4    operations and financial projections, evaluating the Debtors' liquidity and short-term cash flows,

5    evaluating the Debtors' potential debt capacity in light of its projected cash flows, evaluating

6    various out-of-court and in-court restructuring alternatives, and negotiating with the Debtors'

7    creditors regarding these alternatives.

8            The Debtors' estates have benefited from Houlihan's work to date, and will

9    continue to benefit from Houlihan's services in assisting the Debtors throughout these

10   proceedings.

11           All professionals comprising or associated with Houlihan who will render services

12   to the Debtors have experience in providing the aforementioned services to business entities, both

13   in and out of bankruptcy, and their individual biographies are attached to the Fishman

14   Declaration.

15                           **Houlihan's Compensation**

16           By this Application, the Debtors request approval of the terms of compensation to

17   Houlihan set forth in detail in the Engagement Letter, subject to the following modifications and

18   clarifications:

19       a.  Houlihan will be paid $125,000 per month (the "<u>Monthly Fee</u>") for the services
            to be provided pursuant to the Engagement Letter. Houlihan's entitlement to
20          the Monthly Fee shall be approved under section 328(a), but Houlihan will be
            required to file monthly fee applications setting forth the services provided by
21          Houlihan during the subject month, which applications will include time
            records describing generally the services rendered and setting forth the names
22          of the individuals rendering such services in not less than half-hour increments
            and records identifying the costs and expenses (including any attorneys fees for
23          which Houlihan seeks reimbursement) for which Houlihan seeks
            reimbursement. **Those monthly fee applications shall be subject to review**
24          **under the standards set forth in section 328(a).**

25       b.  Restructuring Transaction Fee ("<u>Restructuring Transaction Fee</u>"). Upon the
            effective date of a confirmed plan of reorganization under Chapter 11 of the
26          Bankruptcy Code, which constitutes a Restructuring Transaction, Houlihan
            shall be entitled to a Restructuring Transaction Fee of $750,000. Payment of
27          the Restructuring Transaction Fee shall be subject to Court approval following
            Houlihan's submission of a fee application requesting the allowance and
28          payment of such Restructuring Transaction Fee under the provisions of

Bankruptcy Code section 330(a). **Thus, the Restructuring Transaction Fee shall be subject to review under the standards set forth in section 330(a).**

   c. Reimbursement of Houlihan's out-of-pocket expenses incurred in connection with its services under the Engagement Letter shall be subject to review in conjunction with Houlihan's submission of the fee applications described above.

   d. In addition, in response to specific concerns raised by the UST and the Committee, Houlihan agrees to modify the Engagement Letter in the following respects:

- The Debtors' obligation to reimburse Houlihan for travel expenses shall only extend to travel expenses <u>after</u> Houlihan has taken into account any credits or rebates.

- **Page 3,** paragraph 7 of the "Standard Terms" that are appended to the Engagement Letter contains the following sentence: "Houlihan is providing the Company with Houlihan's services hereunder as an independent contractor, and the parties agree that this Agreement does not create an agency, fiduciary, or third-party beneficiary relationship between Houlihan, on the one hand, and the Company and/or its creditors, on the other hand." This sentence shall be modified to delete the second clause that states "and the parties agree that this Agreement does not create an agency, fiduciary, or third-party beneficiary relationship between Houlihan, on the one hand, and the Company and/or its creditors, on the other hand."

- **Page 7,** paragraph 21 of the "Standard Terms" that are appended to the Engagement Letter contains the following sentence (at the end of the second paragraph of paragraph 21): "Notwithstanding the foregoing, the aggregate contribution of all Indemnified Parties to any such losses, claims, damages, liabilities and expenses shall not exceed the amount of fees actually received by Houlihan pursuant to the Agreement." This sentence shall be deleted.

Prior to the Petition Date, Houlihan received three installments of its monthly retainer totaling $375,000 pursuant to the Engagement Letter, plus reimbursement of expenses totaling $16,714.65.

### Disinterestedness

To the best of the Debtors' knowledge, and based upon the Fishman Declaration, neither Houlihan, nor any of its shareholders, has any connection with the Debtors, any creditors of these estates, any parties in interest, its attorneys or accountants, any bankruptcy judge of this Court, the United States Trustee or any person employed in the Office of the United States Trustee, that would in any way render Houlihan not disinterested under the Bankruptcy Code, except as described therein.

The following supplemental disclosures are made in lieu of the Bankruptcy Court's optional Form 2014-1, entitled "Statement of Disinterestedness for Employment of Professional Person under F.R.B.P. 2014." References to Houlihan include all members who are expected to render services in this case:

a.    Houlihan does not hold a prepetition claim against the Debtors' estate.

b.    Houlihan is not and was not an equity security holder, or an insider of the Debtors.

c.    Houlihan is not and was not an investment banker for any outstanding security of the Debtors.

d.    Houlihan is not and was not, within three years before the Petition Date, an investment banker for a security of the Debtors or an attorney for such investment banker in connection with the offer, sale or issuance of any security of the Debtors.

e.    Houlihan is not and was not, within two years before the Petition Date, a director, officer or employee of the Debtors, or of any investment banker for the security of the Debtors.

f.    Subject to the disclosures contained in the Fishman Declaration, Houlihan has no interest adverse to the interests of the estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors or an investment banker for any security of the Debtors or for any other reason.

g.    On October 30, 2003, Houlihan rendered an opinion as to the fairness, from a financial point of view, of the financial terms of the loan agreement entered into by the Debtors with SHOP III.

h.    The name, address and phone number of the person signing on behalf of Houlihan and the relationship of such person to Houlihan are listed in the signature block of the attached Fishman Declaration.

## **Approval Of Compensation Arrangements**

The Debtors' seek approval of Houlihan's "monthly fee" component pursuant to Bankruptcy Code section 328(a), which provides in pertinent part that:

> The trustee, or a Debtor appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. . . .

11 U.S.C. § 328(a). The Supplemental Memo sets forth in detail why approval of the monthly fee component of Houlihan's proposed employment is reasonable and should be approved under section 328(a).

The Debtors seek approval of Houlihan's Restructuring Transaction Fee pursuant to Bankruptcy Code section 330(a), which provides in pertinent part that the Court may award "reasonable compensation for actual, necessary services rendered" by a professional person. Thus, section 330(a), which provides the Court with greater discretion in reviewing a professional fee claim, would apply to the Court's consideration of any Restructuring Transaction Fee that might be sought.

By this Application, the Debtors request that the Court approve the above-described compensation arrangements, pursuant to Bankruptcy Code sections 328(a) and 330(a), respectively. The compensation arrangements contained in the Engagement Letter are highly beneficial to the Debtors' estates, as they provide certainty and proper inducement for Houlihan to act expeditiously and prudently.

Pursuant to Local Rule 2014-1(b)(1) and the United States Trustee Guidelines, the Debtors have filed this Application directly with the Court. The Debtors have served notice of the Application on the Office of the United States Trustee, the Debtors' principal secured creditors, counsel for the Committee and all parties requesting special notice.

## **Request for Relief**

Based on the facts and disclosures above, the Debtors respectfully request authority to employ and retain Houlihan and its various principals and employees as their financial advisor as of the Petition Date, that the Court approve the terms of employment set forth in the Engagement Letter, as modified, clarified and refined herein, that the Court approve the

compensation of Houlihan at the expense of the Debtors' estates, on the terms set forth in the

Engagement Letter, as modified, clarified and refined herein.

Dated: November 4, 2004          **AMERICAN RESTAURANT GROUP, INC.**, et al.
                                  Debtors and Debtors in Possession


                                  By:    Patrick J. Kelvie
                                  Title: Vice President/General Counsel

## DECLARATION OF THOMAS R. KRELLER

I, Thomas R. Kreller, declare as follows:

1.      I am a partner in the firm of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP ("Milbank").  Milbank is an international law firm with its principal office located at 1 Chase Manhattan Plaza, New York, New York 10005, and additional offices located in Washington, D.C., Los Angeles and Palo Alto, California, London, Frankfurt, Munich, Tokyo, Singapore, and Hong Kong.  I am duly authorized to make this declaration on behalf of Milbank.  I am over the age of eighteen and a resident of Los Angeles County.

2.      Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I would so testify thereto.  Certain of the disclosures set forth herein relate to matters within the knowledge of other attorneys at Milbank and are based on information provided by them to me.

3.      I am one of the partners at Milbank that is primarily responsible for the representation of the Debtors in the above-captioned chapter 11 cases.  Under my direction and at the instruction of the Debtors, Milbank has filed with the Bankruptcy Court several pleadings in connection with the Debtors' request for authorization to employ and compensate Houlihan Lokey Howard & Zukin Capital Inc. ("Houlihan").  Attached hereto are true and correct copies of the following pleadings that have been filed with the Bankruptcy Court and appear on the Bankruptcy Court's docket:

a.      Exhibit 1:  Declaration Of Peter S. Fishman In Support Of Application Of Debtors For An Order Authorizing The Approval Of Employment And Compensation Arrangements Of Houlihan Lokey Howard & Zukin Capital Pursuant To Bankruptcy Code Sections 327(a) And 328(a), filed on October 5, 2004.

b.      Exhibit 2:  Application Of Debtors For An Order Authorizing The Approval Of Employment And Compensation Arrangements Of Houlihan Lokey

1  Howard & Zukin Capital Pursuant To Bankruptcy Code Sections 327(a) And
2  328(a).

3        c.      Exhibit 3: Debtors' Supplemental Memorandum In Support Of
4  Application To Employ Houlihan Lokey Howard & Zukin Capital, Inc. As
5  Financial Advisor And Investment Banker For The Debtors; Declarations Of
6  William Taves And Andrew Miller In Support Thereof, filed On October 27, 2004.

7        I declare under penalty of perjury under the laws of the United States of America
8  that the foregoing is true and correct.

9        Executed this 4th day of November, 2004, at Los Angeles, California.

Thomas R. Kreller

1 | Robert Jay Moore (#77495)
Thomas R. Kreller (#161922)
2 | David B. Zolkin (#155410)
MILBANK, TWEED, HADLEY & McCLOY LLP
3 | 601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
4 | Telephone: (213) 892-4000
Facsimile: (213) 629-5063
5 |
Proposed Attorneys for
6 | American Restaurant Group, Inc., et al.
Debtors and Debtors-in-Possession
7 |

FILED

**OCT - 5 2004**

CENTRAL U.S. BANKRUPTCY COURT
Central Division of California
Deputy Clerk

8 | **UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
9 | **LOS ANGELES DIVISION**

10 | In re               )    Case Nos.   LA 04-30732 TD
                       )               LA 04-30734 TD
11 | **AMERICAN RESTAURANT**    )              LA 04-30736 TD
**GROUP, INC.**, a Delaware corporation; )
12 | **ARG ENTERPRISES, INC.**, a     )        Jointly Administered Under
California corporation; **ARG**      )        Case No. LA 04-30732 TD
13 | **PROPERTY MANAGEMENT**    )
**CORPORATION**, a California     )     Chapter 11 Cases
14 | corporation.                 )
                       )    **DECLARATION OF PETER S. FISHMAN**
15 | (commonly known as "**Stuart**    )    **IN SUPPORT OF APPLICATION OF**
**Anderson's Black Angus Restaurants**") )   **DEBTORS FOR AN ORDER**
16 | or "**Stuart Anderson's Cattle**    )    **AUTHORIZING THE APPROVAL OF**
**Company Restaurant**")        )    **EMPLOYMENT AND COMPENSATION**
17 |                        )    **ARRANGEMENTS OF HOULIHAN**
Debtors and Debtors-in-Possession.   )   **LOKEY HOWARD & ZUKIN CAPITAL**
18 |                        )    **PURSUANT TO BANKRUPTCY CODE**
                       )    **SECTIONS 327(a) AND 328(a)**
19 |                        )
Affects all three Debtors: __X__    )
20 |                        )
Affects only:               )    Hearing
21 |                        )
American Restaurant Group Inc. ____ )   Date:   October 22, 2004
22 |                        )    Time:   1:00 p.m.
ARG Enterprises Inc. ____       )    Place:   Courtroom 1345, Roybal Federal Bldg.
23 |                        )                   255 East Temple Street
ARG Property Management Corp. ____ )                   Los Angeles, California
24 |                        )

25 |
26 |
27 |
28 |

LA1 #6290069

**EXHIBIT 1**

I, Peter S. Fishman, declare as follows:

1.     I am over the age of eighteen and if called upon to testify to the following could and would do so based upon my personal knowledge.

2.     I am a Senior Vice President in the Financial Restructuring Group of Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey"), which provides investment banking, valuation and financial advisory services from offices located in Los Angeles, New York, London, Chicago, Atlanta, San Francisco, Washington D.C., Minneapolis, and Dallas. This Declaration is submitted in support of the application of the above-captioned Debtors (the "Debtors") in these chapter 11 cases for an Order authorizing the employment and retention of Houlihan Lokey as financial advisors and investment bankers to the Debtors. In addition to myself, the principal professionals who have and are expected to render services to the Debtors are as follows: Andrew Miller (Managing Director), Eric Winthrop (Vice President), Craig Styris (Associate), Christian Digemose (Financial Analyst), and Clifford Sosin (Financial Analyst). A summary of the qualifications of the principal professionals is attached hereto as Exhibit 1 and is incorporated herein by this reference.

3.     This Declaration is also submitted as the statement required pursuant to sections 328(a), 329 and 504 of title 11, United States Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code") and Rules 2014(a) and 2016(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.     Except as set out below, neither I, nor Houlihan Lokey, nor any officer of the firm, insofar as I have been able to ascertain, has any connection with the Debtors in these chapter 11 cases, or any interest materially adverse to the interest of any class of creditors or equity security holders by reason of any direct or indirect relationship to the Debtors, or their twenty largest creditors, or any other parties in interest herein, or their respective attorneys.

5.     Our Financial Restructuring Group provides a range of financial advisory, investment banking, and valuation services to debtors-in-possession, creditors' committees, acquirers, and other parties in interest in connection with bankruptcy cases and financially distressed situations. I, and other professionals employed by Houlihan Lokey, have been

involved in numerous bankruptcy and distressed situations from a variety of perspectives. Our firm is one of the most active and experienced restructuring advisors in the country. We have advised, or are presently advising debtors, lenders and committees in many of the largest financial restructurings over the last decade.

6.  Houlihan Lokey has agreed to provide investment banking and financial advisory services to Debtors in the above-captioned chapter 11 cases before this Court, pursuant to the terms and conditions of the engagement agreement between the Debtors and Houlihan Lokey (the "Engagement Letter"), a copy of which is attached hereto as Exhibit 2.

7.  To determine its relationship with parties in interest in these chapter 11 Cases, Houlihan Lokey has researched its client databases to determine whether it has any relationships with the entities (collectively, the "Interested Parties") that were identified to Houlihan Lokey by the Debtors. Such entities include:

(a)  the Debtors and their non-debtor affiliates;

(b)  the directors and officers of the Debtors;

(c)  the 30 largest unsecured creditors of the Debtors;

(d)  the attorneys and other professionals of the Debtors;

(e)  the significant prepetition lenders of the Debtors;

(f)  the proposed postpetition lenders and their professionals;

(g)  parties believed to hold material amounts of the Debtors' stock and other securities; and

(h)  other potentially adverse parties.

8.  Houlihan Lokey and its affiliates have almost six hundred and fifty (650) employees. Houlihan Lokey has placed the Debtors on Houlihan Lokey's "restricted list," which precludes any employee of Houlihan Lokey from trading in the securities of the Debtors. Some of Houlihan Lokey's present and future employees may have, or may in the future have, personal investments in funds or other entities, over whose investment decisions such employees have no input or control, that may have made, or may in the future make, investments in the Debtors' securities, or those of its creditors, or other parties in interest in these cases.

9.     Based on the results of the foregoing, Houlihan Lokey is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code in that Houlihan Lokey:

     (a)     Does not hold a prepetition claim against the Debtors' estate;

     (b)     is not a creditor, equity security holder or insider of the Debtors;

     (c)     is not and was not an investment banker for any outstanding security of the Debtors;

     (d)     has not been, within three (3) years before the date of the filing of the Debtors' chapter 11 petition, (i) an investment banker for a security of the Debtors, or (ii) an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the Debtors; and

     (e)     is not and was not, within two (2) years before the date of the filing of the Debtors' chapter 11 petition, a director, officer, or employee of the Debtors or of any investment banker as specified in subparagraph (b) or (c) of this paragraph.

10.     On October 30, 2003, Houlihan Lokey rendered an opinion as to the fairness, from a financial point of view, of the financial terms of the loan agreement entered into by the Debtors with SHOP III.

11.     No agreement presently exists to share any compensation received by Houlihan Lokey for its services with any other person or firm. If any such agreement is entered into, Houlihan Lokey undertakes to amend and supplement this Declaration to disclose the terms of any such agreement. No promises have been received by Houlihan Lokey or by any member or employee thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

12.     Prior to the Petition Date, Houlihan Lokey received two installments of its monthly retainer totaling $250,000 pursuant to the Engagement Letter, plus reimbursement of expenses totaling $2,535.69

13.     Houlihan Lokey has thousands of clients, past and present, that are located throughout the world in a variety of industries, including certain of the institutions that are identified as creditors of the Debtors. It is possible that some past or present clients of Houlihan Lokey may have some connection to, or are creditors or holders of securities of, the Debtors. Nevertheless, insofar as I have been able to ascertain, except for the Debtors, Houlihan Lokey has not advised any parties in interest in connection with these chapter 11 cases. The attached Exhibit 3 details the relationship check we performed, and identifies any potential relationships we have with various parties in interest in these cases. None of these relationships in any way renders Houlihan Lokey not disinterested under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

14.     To the best of my knowledge, Houlihan Lokey has not represented the Debtors' creditors, equity security holders, or any other parties in interest, or their respective attorneys and accountants, the United States Trustee for the Central District of California, or any person employed in the office of the United States Trustee, in any matters relating to the Debtors or its estates. Neither I, Houlihan Lokey, nor any other officer of the firm, insofar as I have been able to ascertain, represents any interest adverse to the Debtors herein, or their respective estates in the matters upon which Houlihan Lokey is to be engaged.

15.     To the best of my knowledge, information and belief, Houlihan Lokey is disinterested and holds no materially adverse interest as to the matters upon which Houlihan Lokey is to be retained. To the extent I discover any facts bearing on the matters described herein during the period of Houlihan Lokey's retention, I will supplement the information contained in this Declaration.

16.     I am generally familiar with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and Houlihan Lokey will comply with them, subject to the orders of this Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of September, 2004, at San Francisco, California.

Peter S. Fishman



# HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL

INVESTMENT BANKERS
www.hlhz.com

July 29, 2004

*Confidential*

William G. Taves, Chief Financial Officer
Patrick J. Kelvie, VP, Treasurer, Secretary, and General Counsel
American Restaurant Group, Inc.
4410 El Camino Real, Suite 201
Los Altos, CA 94022

Gentlemen:

Thank you for choosing Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey") as your financial advisor. This letter confirms the terms under which American Restaurant Group, Inc., ARG Enterprises, Inc., ARG Property Management Corporation, ARG Terra, Inc., and Black Angus Enterprises of Idaho, Inc. (collectively, with their respective affiliates and subsidiaries, the "Company") have engaged Houlihan Lokey, effective as of the date indicated above (the "Effective Date"), as its exclusive financial advisor with respect to any potential Transaction(s) (capitalized terms utilized in this letter shall have the meaning ascribed to such terms in the Standard Terms appended hereto, each of which terms are fully incorporated herein by this reference).

1.  **Services To Be Provided By Houlihan Lokey.** In connection with any potential Transaction, Houlihan Lokey will assist and advise the Company with the analysis and evaluation of the Company's business, business plan and strategic and financial position, and with the formulation, evaluation and implementation of various options for a restructuring, reorganization, financing, merger, acquisition or sale of the Company, or its assets or businesses. More specifically, we would expect, among other things, and as requested by Company's Board of Directors, to perform the following services:

    (a)     Assist the Company in the development, preparation and distribution of selected information, documents and other materials necessary for the creation of interest in, and subsequent consummation of, any Transaction(s); solicit and evaluate indications of interest and proposals regarding any Transaction(s); assist the Company with the development, structuring, negotiation and implementation of any Transaction(s), including, among other things, participation, as a representative of the Company, in negotiations with creditors and other parties involved in any Transaction(s);

    (b)     Assist the Company in valuing the Company and/or, as appropriate, valuing the Company's assets or operations; provided that any real estate or fixed asset appraisals will be undertaken by outside appraisers, separately retained and compensated by the Company;

Los Angeles • 1930 Century Park West • Los Angeles, California 90067 • tel.310.553.8871 • fax.310.553.2173
New York   Chicago   San Francisco   Washington, D.C.   Minneapolis   Dallas   Atlanta   London
Broker/dealer services through Houlihan Lokey Howard & Zukin Capital.

(c)      Provide expert advice and testimony regarding financial matters related to any Transaction(s), including, among other things, the feasibility of any Transaction, and the valuation of any securities issued in connection with any Transaction;

(d)      Advise the Company regarding the availability of new debt and/or equity financing, mergers or acquisitions, and/or the sale or other disposition of any of the Company's assets or businesses;

(e)      As requested by the Company, develop a list of potential lenders, equity investors, and/or strategic partners (collectively, "Investors"), and interact with such Investors in an effort to create interest in Transaction(s) with the Company;

(f)      As requested by the Company, assist the Company in the preparation of an appropriate offering memorandum to provide to Investors interested in Transaction(s) with the Company, and submit and discuss such offering memorandum with interested parties, and participate, as a representative of the Company, in the negotiation of Transaction(s) with interested parties;

(g)      Assist the Company with due diligence investigations conducted in connection with any Transaction(s);

(h)      Provide testimony in connection with the foregoing, if necessary; and

(i)   Render, during the term of this Agreement, such additional financial advisory and investment banking services, the identity and compensation for which shall be mutually agreed upon by Houlihan Lokey and the Company.

2.    **Compensation To Be Paid To Houlihan Lokey.**  In consideration of Houlihan Lokey's acceptance of this engagement and performance of services pursuant to this Agreement, Houlihan Lokey shall earn and shall be entitled to receive, and the Company shall pay, the following:

a)   *Monthly Fees*:  In addition to the other fees provided for herein, upon the execution of this Agreement, and on every monthly anniversary of the Effective Date during the term of this Agreement, the Company shall pay Houlihan Lokey, without notice or invoice, a cash fee of $125,000 per month ("Monthly Fee").  Each Monthly Fee shall be earned upon Houlihan Lokey's receipt thereof. Notwithstanding any termination of this Agreement, the Company agrees to pay Houlihan Lokey the Monthly Fee for a minimum of three months; and

b)   *Transaction Fee(s)*:  In addition to the other fees provided for herein, the Company shall pay Houlihan Lokey the following transaction fee(s) ("Transaction Fee(s)"):

        *Restructuring Transaction Fee.* Upon the earlier to occur of: (i) the consummation of an out-of-court Restructuring Transaction; and (ii) the effective date of a confirmed plan of reorganization under Chapter 11 of the Bankruptcy Code, which constitutes a Restructuring Transaction, Houlihan Lokey shall earn, and the Company shall promptly pay to Houlihan Lokey, a Transaction Fee of $750,000 ("Restructuring Transaction Fee");

*Financing Transaction Fee.* Concurrently with the close of each Financing Transaction, but only if, and to the extent that, the Company has requested Houlihan Lokey to seek or obtain a commitment to provide a Financing Transaction, Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly from the proceeds of such Financing Transaction, as a cost of such Transaction, a Transaction Fee ("Financing Transaction Fee") equal to the sum of: (i) 1% of the aggregate principal amount of all senior secured debt raised or committed; (ii) 3% of the aggregate principal amount of all other debt raised or committed; and (iii) 5% of the aggregate amount of all equity and equity equivalents (including convertible securities and preferred stock) placed or committed. Any warrants issued in connection with the raising of debt or equity capital shall, upon the exercise thereof, be considered equity for the purpose of calculating the Financing Transaction Fee, and such portion of the Financing Transaction Fee shall be paid upon such exercise and from the proceeds thereof, regardless of any prior termination or expiration of this Agreement. Notwithstanding the foregoing, no Financing Transaction Fee shall be earned or paid in connection with (i) any Debtor in Possession facility obtained by the Company from Wells Fargo Foothill, or any other existing creditor of the Company, or any affiliate of such creditor, and (ii) any financing obtained in connection with implementation of a Restructuring Transaction, to the extent that (a) Houlihan Lokey has not gone into the market to seek to obtain such financing, and (b) such financing is provided by the Company's existing lenders or Noteholders;

*Sale Transaction Fee.* If, and to the extent that, the Company has requested Houlihan Lokey to seek a Sale Transaction, concurrently with the close of each Sale Transaction, Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly from the proceeds of such Sale Transaction, as a cost of sale, a Transaction Fee in an amount to be negotiated in good faith between the Company and Houlihan Lokey ("Sale Transaction Fee").

3.    **Term and Termination.** This Agreement is terminable upon thirty days' written notice by the Company or Houlihan Lokey; provided, however, that (a) if this Agreement is terminated by the Company during the first three months of the engagement, the Company shall, immediately upon giving Houlihan Lokey notice of the Company's election to terminate, pay Houlihan Lokey the unpaid portion of the Monthly Fees for the first three months of the engagement, as well as any unpaid Transaction Fees and outstanding out-of-pocket expenses that are then due, pursuant o the terms of this Agreement, and (b) if the Agreement is terminated by the Company or Houlihan Lokey after the first three months of the engagement, the Company shall, immediately upon either party giving notice of its election to terminate, pay Houlihan Lokey all then unpaid Monthly Fees, Transaction Fees and outstanding out-of-pocket expenses that are then due, pursuant to the terms of this Agreement.

The termination of this Agreement shall not affect (a) the Company's indemnification, reimbursement, contribution and other obligations as set forth in this Agreement, (b) Houlihan Lokey's obligations hereunder with respect to Confidential Information, and (c) Houlihan Lokey's right to receive, and the Company's obligation to pay, any and all fees and expenses accrued as of the effective date of termination of this Agreement.   In addition, notwithstanding the expiration or termination of this Agreement,

Houlihan Lokey shall be entitled to full payment by the Company of the Transaction Fees described in this Agreement: (i) so long as a Transaction is consummated during the term of this Agreement, or within nine months after the date of termination of this Agreement ("Tail Period"), and/or (ii) if an agreement to consummate a Transaction is executed by the Company during the term of this Agreement, or within the Tail Period, and such Transaction is consummated at any time following such execution with the investor named in such agreement, or with any affiliate, employee or Investor in such Investor, or an affiliate of any of the foregoing.

If the foregoing correctly sets forth our Agreement, please sign and return to us the enclosed duplicate hereof along with a check (or wire transfer confirmation) for $125,000 on account of the first Monthly Fee.

All of us at Houlihan Lokey thank you for choosing us to advise you, and look forward to working with you on this engagement.

Very truly yours,

HOULIHAN LOKEY HOWARD
& ZUKIN CAPITAL, INC.

By: _____

Peter S. Fishman, Senior Vice President

The foregoing Agreement, including the Standard Terms appended hereto, has been read, understood, accepted and approved, and the undersigned does hereby agree to retain Houlihan Lokey Howard & Zukin Capital, Inc. upon the terms and provisions contained therein.

**American Restaurant Group, Inc.**          **ARG Terra, Inc.**

By: _____             By: _____
Name:  Patrick J. Kelvie                 Name:  Patrick J. Kelvie
Title:    Vice President                 Title:    Vice President

**ARG Enterprises, Inc.**

By: _____
Name:  Patrick J. Kelvie
Title:    Vice President

**ARG Property Management Corporation**

By: _____
Name:  Patrick J. Kelvie
Title:    Vice President

Houlihan Lokey shall be entitled to full payment by the Company of the Transaction Fees described in this Agreement: (i) so long as a Transaction is consummated during the term of this Agreement, or within nine months after the date of termination of this Agreement ("Tail Period"), and/or (ii) if an agreement to consummate a Transaction is executed by the Company during the term of this Agreement, or within the Tail Period, and such Transaction is consummated at any time following such execution with the investor named in such agreement, or with any affiliate, employee or Investor in such Investor, or an affiliate of any of the foregoing.

If the foregoing correctly sets forth our Agreement, please sign and return to us the enclosed duplicate hereof along with a check (or wire transfer confirmation) for $125,000 on account of the first Monthly Fee.

All of us at Houlihan Lokey thank you for choosing us to advise you, and look forward to working with you on this engagement.

Very truly yours,

HOULIHAN LOKEY HOWARD
& ZUKIN CAPITAL, INC.

By: _____

Peter S. Fishman, Senior Vice President

The foregoing Agreement, including the Standard Terms appended hereto, has been read, understood, accepted and approved, and the undersigned does hereby agree to retain Houlihan Lokey Howard & Zukin Capital, Inc. upon the terms and provisions contained therein.

**American Restaurant Group, Inc.**

By: _____
Name:   Patrick J. Kelvie
Title:    Vice President

**ARG Enterprises, Inc.**

By: _____
Name:   Patrick J. Kelvie
Title:    Vice President

**ARG Property Management Corporation**

By: _____
Name:   Patrick J. Kelvie
Title:    Vice President

**ARG Terra, Inc.**

By: _____
Name:   Patrick J. Kelvie
Title:    Vice President

## STANDARD TERMS OF ENGAGEMENT AGREEMENT WITH AMERICAN RESTAURANT GROUP, INC. DATED JULY 27, 2004

### 1. Transaction

As used in this Agreement, the term "Transaction" shall mean: Any transaction or series of transactions that effectuates any financial reorganization, recapitalization, consolidation, business combination, merger, acquisition or disposition of stock and/or assets or other similar transaction, including, but not limited to, the following:

#### a) Restructuring Transaction

Each of the following shall constitute a "Restructuring Transaction":

With respect to the Company's obligations and/or indebtedness for borrowed money, including accrued and/or accreted interest thereon, which are outstanding as of the Effective Date, including, without limitation, interest bearing trade debt and the Company's 11.5% Senior Secured Notes (collectively "Indebtedness"): any single transaction or series of transactions that effectuates any reinstatement, any modification, amendment or change of, or in, principal balance, accrued or accreted interest, payment term, other debt service requirement, and/or financial or operating covenant; any forbearance for at least twelve months with respect to any payment obligation; conversion to equity, or some other security or instrument, of any, or all, of such Indebtedness; the implementation of a cash tender offer for any, or all, Indebtedness; any other compromise of the existing terms of any, or all, of such Indebtedness; any combination of the foregoing transactions, including, without limitation, confirmation of a Plan of Reorganization under Chapter 11 of the Bankruptcy Code. Each of the foregoing shall include, without limitation, any transaction in which the requisite consents to a reorganization or restructuring are obtained pursuant to a tender offer, exchange offer, consent solicitation or other process, or a Plan of Reorganization under the Bankruptcy Code.

#### b) Sale Transaction

Each of the following shall constitute a "Sale Transaction", whether or not the Company becomes a debtor under Chapter 11 of the Bankruptcy Code, and whether or not such transaction is consummated under Section 363, 1129, or other provision of the Bankruptcy Code:

    i. Any merger, consolidation, reorganization, recapitalization, business combination, sale or other single transaction or series of transactions, pursuant to which the Company is acquired by, or combined with, any person, group of persons, partnership, corporation or other entity, including, without limitation, any of the Company's existing owners, shareholders, employees, creditors or affiliates (each an "Acquirer"); or

    ii. The acquisition, directly or indirectly by an Acquirer (or by one or more persons acting together with an Acquirer pursuant to a written agreement or otherwise), in a single transaction or a series of transactions, of: (x) all or any material portion of the assets or operations of the Company, or all or any material portion of any operating division of the Company; or (y) all, substantially all, or a majority of the outstanding or newly issued shares of the Company's capital stock, the capital stock of any subsidiary of the Company, or any securities convertible into, or options, warrants or other rights to acquire, such capital stock.

c) Financing Transaction

Each of the following transactions shall constitute a "Financing Transaction," whether or not such transaction is effectuated in-court, out-of-court, through the confirmation of a plan of reorganization or otherwise under the United States Bankruptcy Code, or whether the requisite consents to such transaction(s) are obtained in-court or out-of-court:

     i.    Any refinancing of all or any portion of the Company's existing obligations; and/or

    ii.    The raising or issuance of any form of new equity or debt financing by the Company, or any entity formed by, or at the direction of, or which is a majority-owned subsidiary, or affiliate, of the Company, from any source including, without limitation, any of the Company's existing owners, shareholders, employees, creditors or affiliates.

## 2. Other Services

To the extent the Company requests Houlihan Lokey to perform additional services not contemplated by this Agreement, such services, and the fees therefore, shall be mutually agreed upon by Houlihan Lokey and the Company, in writing, in advance

## 3. Post-Termination Services

If, at any time after the termination of this Agreement, Houlihan Lokey is required to render services directly or indirectly relating to the subject matter of this Agreement, including, but not limited to, producing of documents, answering interrogatories, giving depositions, giving expert or other testimony, whether by agreement, subpoena or otherwise, the Company shall pay Houlihan Lokey's then current hourly rates for such post-termination services for the time expended by the persons involved in rendering such services, including, but not limited to, time for meetings, conferences, preparation and travel, and all reasonable related costs and expenses, inclusive of the reasonable legal fees and expenses of Houlihan Lokey's counsel.

## 4. Expenses

In addition to the fees described above, the Company agrees to promptly reimburse Houlihan Lokey, upon request from time to time, for all out-of-pocket expenses reasonably incurred by Houlihan Lokey in connection with the matters contemplated by this Agreement, including, without limitation, reasonable fees of counsel. Houlihan Lokey bills its clients for its reasonable out-of-pocket expenses fortravel-related expenses, without regard to volume-based or similar credits or rebates Houlihan Lokey may receive from travel agents and airlines on a periodic basis..

## 5.

### Reasonableness of Fees

The parties acknowledge that a substantial professional commitment of time and effort will be required of Houlihan Lokey and its professionals hereunder, and that such commitment may foreclose other opportunities for the firm. Moreover, the actual time and commitment required for the engagement may vary substantially, creating "peak load" issues for the firm. Given the numerous issues that may arise in engagements such as this, Houlihan Lokey's commitment to the variable level of time and effort necessary to address such issues, the expertise and capabilities of Houlihan Lokey that will be required in this engagement, and the market rate for Houlihan Lokey's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Houlihan Lokey, and provides the requisite certainty to the Company.

### 6. Invoicing and Payment

Payments to Houlihan Lokey shall be made in same-day funds by wire transfer in lawful money of the United States, to such accounts as Houlihan Lokey shall direct, and the Company shall provide contemporaneous written notice of each such payment to Houlihan Lokey.

### 7. Limitations on Services as Advisor

Houlihan Lokey's services are limited to those specifically provided in this Agreement, or subsequently agreed upon, in writing, by the parties hereto. Houlihan Lokey shall have no obligation or responsibility for any other services including, without limitation, any crisis-management or business-consulting services related to, among other things, the implementation of any operational, organizational administrative, cash management, or similar activities. Houlihan Lokey is providing the Company with Houlihan Lokey's services hereunder as an independent contractor, and the parties agree that this Agreement does not create an agency, fiduciary, or third-party beneficiary relationship between Houlihan Lokey, on the one hand, and the Company and/or its creditors, on the other hand. In performing its services pursuant to this Agreement, Houlihan Lokey is not assuming any responsibility for the Company's decision to pursue, or not to pursue, any business strategy, or to effect, or not to effect, any Transaction(s), which decision shall be made by the Company in its sole discretion.

### 8. Exclusive Agency

Except as otherwise provided herein, until this Agreement is terminated, the Company agrees that it will not, directly or indirectly, contact, approach or negotiate with any person or persons regarding any Transaction without notifying Houlihan Lokey thereof. In the event the Company receives any inquiry regarding a Transaction, the Company shall promptly inform Houlihan Lokey of such inquiry so that Houlihan Lokey may evaluate such party and its interest in a transaction, and assist the Company in any resulting negotiations.

### 9. Assignability

The benefits of this Agreement shall inure to the parties hereto, their respective successors and assigns, and to the Indemnified Parties hereunder and their respective successors and assigns and representatives, and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns, provided that Houlihan Lokey may not assign its obligations under this Agreement without the written consent of the Company. If appropriate, in connection with performing its services for the Company hereunder, and with the

Company's prior consent, Houlihan Lokey may utilize the services of one or more of its affiliates, including, but not limited to, Houlihan Lokey Howard & Zukin Financial Advisors Inc., in which case the references herein to Houlihan Lokey shall include such affiliates, provided, however, that the fees and other obligations described herein comprise all compensation and other obligations to be paid to Houlihan Lokey and its affiliates, and neither Houlihan Lokey, nor any affiliate of Houlihan Lokey, shall charge any separate or additional fees, or seek the payment of any additional obligations, for services rendered pursuant hereto.

## 10.  Credit

Upon consummation of any Transaction, Houlihan Lokey may, at is own expense, and only with the prior consent of the Company to the form thereof, place advertisements in financial and other newspapers and periodicals (such as a customary "tombstone" advertisement), or make similar announcements describing its services in connection therewith.

## 11. Information

The Company agrees to cooperate with Houlihan Lokey as reasonably required for Houlihan Lokey to perform the services hereunder. Among other things, the Company will furnish to, or cause to be furnished to, Houlihan Lokey, any and all information and data in the Company's possession, or under its control, concerning the Company (the "Information"), and will provide Houlihan Lokey with access to the Company's officers, directors, employees, appraisers, independent accountants, legal counsel and other consultants and advisors. The Company represents and warrants that all Information, other than projections of future performance or facts ("Projections"), (a) made available to Houlihan Lokey, or (b) contained in any filing by the Company with any court or any governmental or regulatory agency, commission or instrumentality each (an "Agency"), will, at the time it is furnished, be complete and accurate in all material respects, unless the Company notifies Houlihan Lokey of specific inaccuracies or missing portions thereof. The Company shall promptly notify Houlihan Lokey if the Company learns of any material misstatement in, or material omission from, any information previously delivered to Houlihan Lokey. The Company further represents and warrants that any Projections or other forward-looking information provided by it to Houlihan Lokey will have been prepared in good faith, and will be based upon assumptions which the Company believes, based upon the circumstances under which they were made, are reasonable, it being understood that Projections are not facts, and actual results and events may vary significantly from the Projections. The Company acknowledges and agrees that, in rendering its services hereunder, Houlihan Lokey will be using and relying on the Information and Projections (and information available from public sources and other sources deemed reliable by Houlihan Lokey) without independent verification thereof by Houlihan Lokey, or independent appraisal by Houlihan Lokey. Houlihan Lokey does not assume responsibility for the accuracy or completeness of the Information, or any other information regarding the Company.

Any financial advice, written or oral, provided by Houlihan Lokey pursuant to this Agreement is intended solely for the use and benefit of the Company, its board of directors and management, and the Company agrees that, except as may be required by law or court process, such advice may not be disclosed publicly, or made available to third parties, without the prior written consent of Houlihan Lokey, which consent shall not be unreasonably withheld, provided, however, that such advice may be made available to, and relied upon by the Company's board of directors.

12.

### Confidential Information

Houlihan Lokey acknowledges and agrees that in rendering services pursuant to this Agreement, it will receive certain non-public and proprietary information concerning the Company and/or its affiliates ("Confidential Information"), and Houlihan Lokey agrees that no Confidential Information will be disclosed to any person other than to any holder of debt for borrowed money of the Company, or to any representative or other affiliate of such holder, to a potential party to a Transaction under appropriate assurances of confidentiality, to those representatives of Houlihan Lokey for the purposes of performing services under this Agreement, or as may be required by legal process, provided that adequate notice of such process is provided to the Company.

### 13. Bankruptcy Court Approval

In the event that the Company is or becomes a debtor under Chapter 11 of the Bankruptcy Code, whether voluntarily or involuntarily, the Company shall seek an Order authorizing the employment of Houlihan Lokey pursuant to the terms of this Agreement, as a professional person pursuant to, and subject to the standard of review of, Section 328(a) of the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and Orders. The Company shall submit Houlihan Lokey's employment application on the first day of any Chapter 11 filing, or as soon as practicable thereafter, and use its best efforts to cause such application to be considered on the most expedited basis. The employment application and the Order authorizing employment of Houlihan Lokey shall be provided to Houlihan Lokey as much in advance of any Chapter 11 filing as is practicable, and must be acceptable to Houlihan Lokey in its sole discretion. If the Order authorizing the employment of Houlihan Lokey is obtained, the Company shall pay all fees and expenses due pursuant to this Agreement, as approved by the Court, as promptly as possible in accordance with the terms of this Agreement and the Order of the Court, the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and orders, and will work with Houlihan Lokey to promptly file any and all necessary applications regarding such fees and expenses with the Bankruptcy Court. If the Order authorizing the employment of Houlihan Lokey is not obtained, or is later reversed or set aside for any reason, Houlihan Lokey may terminate this Agreement, and the Company shall reimburse Houlihan Lokey for all fees and expenses reasonably incurred prior to the date of termination, subject to the requirements of the Bankruptcy Code, Bankruptcy Rules and applicable local rules and Orders. The terms of this paragraph are solely for the benefit of Houlihan Lokey, and may be waived, in whole or in part, only by Houlihan Lokey.

### 14. Choice of Law; Jurisdiction; Jury Waiver

THIS AGREEMENT HAS BEEN NEGOTIATED, EXECUTED AND DELIVERED AT, AND SHALL BE DEEMED TO HAVE BEEN MADE IN, CALIFORNIA. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA. REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF CALIFORNIA, PROVIDED THAT SUCH CONSENT AND AGREEMENT SHALL NOT BE DEEMED TO REQUIRE ANY BANKRUPTCY CASE INVOLVING THE COMPANY TO BE FILED IN SUCH COURTS. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT. EACH PARTY HEREBY WAIVES

ANY OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON-CONVENIENS, AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. THE COMPANY AND HOULIHAN LOKEY EACH CONSENTS TO SERVICE OF PROCESS IN ACCORDANCE WITH CALIFORNIA LAW.

## 15. Attorneys' Fees and Court Costs

If any party to this Agreement brings an action, directly or indirectly, based upon this Agreement, or upon the matters contemplated hereby, against the other party, the prevailing party shall be entitled to recover, in addition to any other appropriate amounts, its reasonable costs and expenses in connection with such proceeding, including, but not limited to, reasonable attorneys' fees and court costs.

## 16. Severability

If it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that any term or provision hereof is invalid or unenforceable: (i) the remaining terms and provisions hereof shall be unimpaired and shall remain in full force and effect; and (ii) the invalid or unenforceable provision or term shall be replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term or provision.

## 17. Entire Agreement

This Agreement embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters provided for herein. No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing and signed by a duly authorized representative of each party.

## 18. Authority

The Company has all requisite corporate power and authority to enter into this Agreement. The Company and Houlihan Lokey have fully reviewed this Agreement, have obtained counsel on its terms, and have participated in the drafting of this Agreement, such that it shall not be construed against any one party. This Agreement has been duly and validly authorized by all necessary corporate action on the part of the Company and Houlihan Lokey and has been duly executed and delivered by the Company and Houlihan Lokey and constitutes a legal, valid and binding agreement of the Company and Houlihan Lokey, enforceable in accordance with its terms.

## 19. Miscellaneous

Nothing in this Agreement, express or implied, is intended to confer, or does confer, on any person or entity, other than the parties hereto and their respective successors and permitted assigns and, to the extent expressly set forth in this Agreement, the other Indemnified Parties, any rights or remedies under or by reason of this Agreement, or as a result of the services to be rendered by Houlihan Lokey hereunder.

The Company agrees that it shall be solely responsible for ensuring that any Transaction complies with applicable law.

The obligations of each entity or company comprising the Company hereunder are joint and several, and any consent, direction, approval, demand, notice or the like given by any one of such entities or companies shall be deemed given by all of them and, as such, shall be binding on the Company.

## 20. Counterparts

For the convenience of the parties, any number of counterparts of this Agreement may be executed by the parties hereto. Each such counterpart shall, and shall be deemed to be, an original instrument, but all such counterparts taken together shall constitute one and the same Agreement.

## 21. Indemnification and Contribution

As a material part of the consideration for the agreement of Houlihan Lokey to furnish its services under the Agreement, the Company agrees to indemnify and hold harmless Houlihan Lokey and its affiliates, and their respective past, present and future directors, officers, shareholders, employees, agents and controlling persons within the meaning of either Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934, as amended (collectively, the "Indemnified Parties"), to the fullest extent lawful, from and against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to the Agreement, any actions taken or omitted to be taken by an Indemnified Party (including acts or omissions constituting ordinary negligence) in connection with the Agreement, or any Transaction or proposed Transaction contemplated thereby. In addition, the Company agrees to reimburse the Indemnified Parties for any legal or other expenses reasonably incurred by them in respect thereof at the time such expenses are incurred; provided, however, the Company shall not be liable under the foregoing indemnity and reimbursement agreement for any loss, claim, damage or liability which is finally judicially determined to have resulted from the willful misconduct, fraud, bad faith or gross negligence of any Indemnified Party.

If for any reason the foregoing indemnification is unavailable to any Indemnified Party or insufficient to hold it harmless, the Company shall contribute to the amount paid or payable by the Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company, on the one hand, and Houlihan Lokey, on the other hand, in connection with the actual or potential Transaction and the services rendered by Houlihan Lokey. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law or otherwise, then the Company shall contribute to such amount paid or payable by any Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Company, on the one hand, and Houlihan Lokey, on the other hand, in connection therewith, as well as any other relevant equitable considerations. Notwithstanding the foregoing, the aggregate contribution of all Indemnified Parties to any such losses, claims, damages, liabilities and expenses shall not exceed the amount of fees actually received by Houlihan Lokey pursuant to the Agreement.

The Company shall not effect any settlement or release from liability in connection with any matter for which an Indemnified Party would be entitled to indemnification from the Company, unless such settlement or release contains a release of the Indemnified Parties reasonably satisfactory in form and substance to Houlihan Lokey. The Company shall not be required to indemnify any Indemnified Party for any amount paid or payable by such party in the settlement or compromise of any claim or action without the Company's prior written consent.

Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange, or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant proportion of its assets, or (ii) significant

recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth herein, the Company will notify Houlihan Lokey in writing thereof (if not previously so notified) and, if requested by Houlihan Lokey, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth herein, including the assumption of such obligations by another party, insurance, surety bonds or the creations of an escrow, in each case in an amount and upon terms and conditions reasonably satisfactory to Houlihan Lokey.

The Company further agrees that neither Houlihan Lokey nor any other Indemnified Party shall have any liability, regardless of the legal theory advanced, to the Company or any other person or entity (including the Company's equity holders and creditors) related to or arising out of Houlihan Lokey's engagement, except for any liability for losses, claims, damages, liabilities or expenses incurred by the Company which are finally judicially determined to have resulted from the willful misconduct, fraud, bad faith or gross negligence of any Indemnified Party. The indemnity, reimbursement, contribution and other obligations and agreements of the Company set forth herein shall apply to any modifications of the Agreement, shall be in addition to any liability which the Company may otherwise have, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and each Indemnified Party. The foregoing provisions shall survive the consummation of any Transaction and any termination of the relationship established by the Agreement.

The Company shall cause any new company that may be formed by the Company, or any of its affiliates, for any purpose, to agree to indemnify Houlihan Lokey in accordance with the foregoing indemnification provisions.

CONFIDENTIAL

EXHIBIT 2

## BIOGRAPHIES OF MEMBERS OF

## HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL

## EXPECTED TO RENDER SERVICES TO THE DEBTORS

### Andrew B. Miller

Mr. Miller is a Managing Director in the Financial Restructuring Group in the Los Angeles office of Houlihan Lokey. Mr. Miller has consummated over 150 transactions, including in- and out-of-court restructurings, as well as distressed company mergers and acquisitions. Mr. Miller founded the Houlihan Lokey Distressed Company M&A Group, which has handled more distressed company M&A assignments than any other firm.

Mr. Miller founded the American Bankruptcy Institute's Committee on Investment Banking and Corporate Finance and founded the Committee's annual Dealmaker's Conference in New York City. Mr. Miller authored Buying and Selling the Distressed Company and Advising the Distressed Company, both of which have been used to educate many of the industry's key participants. Mr. Miller has been listed in the K&A Restructuring Register, which is a peer group listing of the top 100 attorneys and financial advisors who practice in the restructuring, reorganization, insolvency and bankruptcy arenas in the United States. Mr. Miller is ranked as one of the most active distressed company investment bankers by The Deal and the youngest person named to the Los Angeles Business Journal's Who's Who of Banking & Finance Turnaround Specialists.

Mr. Miller is also a respected speaker on financial restructuring issues. He has spoken on such diverse topics as Trends and Opportunities in U.S. Restructurings, Financing the Sale of a Distressed Company, Financial Restructuring in the New Economy, Distressed Company M&A—Issues and Trends, Chapter 11 Bidding Procedures & Buyer Protections, Trends in the German Distressed Debt Market, Valuation of Troubled Companies, Exit Scenarios and Financing, and Early Warning Signs and Early Lender Responses. Mr. Miller also lectures at the UCLA School of Law.

Prior to joining Houlihan Lokey, Mr. Miller was a management consultant with the Boston Consulting Group and Bain & Company. Mr. Miller holds a J.D. from the University of Chicago Law School, an M.B.A. from the University of Chicago Graduate School of Business and a B.S. in business administration, with highest honors, from the University of California, Berkeley. Mr. Miller is registered with the NASD as a General Securities Principal (Series 7, 24 and 63).

### Peter S. Fishman

Mr. Fishman is a Senior Vice President in the Financial Restructuring Group in the San Francisco office of Houlihan Lokey. Mr. Fishman leads the Firm's Restructuring and Distressed Company M&A practice in San Francisco, and brings to the Firm's Financial Restructuring Group a unique and extensive background in business, finance and law. Prior to joining Houlihan Lokey, Mr. Fishman was a director with Helix Capital, a private merchant bank involved in both equity investing and M&A advisory work. During a fifteen-year legal career, Mr. Fishman specialized in turning around under-performing and troubled companies through financial reorganizations and restructurings. He was one of the founders of Levene & Eisenberg, a nationally known

bankruptcy, workout and financial restructuring law firm, where he was managing partner. Following that, Mr. Fishman headed the bankruptcy, insolvency and workout departments of three major San Francisco law firms. Prior to his legal career, Mr. Fishman served as vice president of marketing for a major health-care subsidiary of W.R. Grace, where he led that company's marketing effort of long-term hospital pharmacy management contracts. In addition, he was the British Commercial Vice-Consul, leading efforts to promote both trade and investment links between the U.S. and the U.K, and was instrumental in the establishment of several international distribution agreements and transatlantic joint ventures. Prior to that, Mr. Fishman was a financial analyst at Mattel, Inc., where he was responsible for financial planning and reporting for manufacturing operations in the U.S. and the Far East. Mr. Fishman holds a J.D. from Loyola Marymount University, an M.B.A. from the University of California, Los Angeles, where he was a Lowenhaupt Scholar, and a B.S. degree from the University of Birmingham, England. Mr. Fishman is a frequent speaker on financial restructuring and reorganization topics.

## Eric M. Winthrop

Mr. Winthrop is a Vice President in the Financial Restructuring Group in the Los Angeles office of Houlihan Lokey. Prior to joining the Firm, Mr. Winthrop was a member of the Corporate Finance, Restructuring and Disputes Group of Price Waterhouse LLP, specializing in operational consulting for financially distressed companies. Mr. Winthrop holds a B.A. in business economics, with honors, from the University of California at Santa Barbara. Mr. Winthrop is registered with the NASD as a General Securities Representative (Series 7, 63).

## Craig J. Styris

Mr. Styris is an Associate in the Financial Restructuring Group in the Los Angeles office of Houlihan Lokey. Mr. Styris holds a Graduate Diploma in finance and a Bachelor of Management Studies with a double major in accounting and economics from the University of Waikato, New Zealand. Mr. Styris spent a year on exchange at the Haas School of Business at the University of California, Berkeley.

## Christian A. Digemose

Mr. Digemose is a Financial Analyst in the Financial Restructuring Group in the Los Angeles office of Houlihan Lokey. Prior to joining the Firm, Mr. Digemose co-founded 2Kweb, a Danish I.T. company, where he was responsible for the company's marketing and finance activities. He also worked on the Presidential Campaign Advance Staff for Al Gore and served as a Squad Leader and Security Planner in the Royal Regiment of the Danish Army. Mr. Digemose holds a B.B.A. in international business management and organization, summa cum laude and management departmental honors, from the University of Miami. He is fluent in Danish.

## Clifford Sosin

Mr. Sosin is a Financial Analyst in the Financial Restructuring Group in Houlihan Lokey's Los Angeles office. Prior to joining the firm, Mr. Sosin was an analyst intern at Apollo Management in New York City where he evaluated distressed debt and leveraged buyout opportunities. Mr. Sosin holds a B.S. in engineering, with a specialty in electrical engineering and control systems, and a B.A. in economics, both with high honors, from Swarthmore College in Pennsylvania.

## EXHIBIT 3

### American Restaurant Group

### Parties In Interest To Whom Houlihan Lokey Has Provided Services

| | |
|---|---|
| Credit Suisse Asset Management | Creditor Advisory |
| GE Capital Finance | Commercial Finance |
| HMA Holding Inc. | ESOP Update |
| Morgan Stanley | Purchase Price Allocation & Estate & Gift Tax |
| Pacific Gas & Electric | Consulting |
| Southern California Edison | Debtor Advisory |
| UBS Securities | FMV Non- Transaction Based Opinion |
| Wells Fargo Foothill, Inc. | FMV Non- Transaction Based Opinion |

| | |
|---|---|
| 1 | Robert Jay Moore (#77495)<br>Thomas R. Kreller (#161922) |
| 2 | David B. Zolkin (#155410)<br>MILBANK, TWEED, HADLEY & McCLOY LLP |
| 3 | 601 South Figueroa Street, 30th Floor<br>Los Angeles, California 90017 |
| 4 | Telephone: (213) 892-4000<br>Facsimile: (213) 629-5063 |
| 5 | |
| 6 | Proposed Attorneys for<br>American Restaurant Group, Inc., et al.<br>Debtors and Debtors-in-Possession |
| 7 | |

FILED

2004 OCT -5 PM 4: 03

_____ DEPUTY

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case Nos.   LA 04-30732 TD |
| | LA 04-30734 TD |
| **AMERICAN RESTAURANT** | LA 04-30736 TD |
| **GROUP, INC.**, a Delaware corporation;<br>**ARG ENTERPRISES, INC.**, a | Jointly Administered Under |
| California corporation; **ARG** | Case No. LA 04-30732 TD |
| **PROPERTY MANAGEMENT** | |
| **CORPORATION**, a California<br>corporation. | Chapter 11 Cases |
| | **APPLICATION OF DEBTORS FOR AN** |
| (commonly known as "**Stuart** | **ORDER AUTHORIZING THE** |
| **Anderson's Black Angus Restaurants**") | **APPROVAL OF EMPLOYMENT AND** |
| or "**Stuart Anderson's Cattle** | **COMPENSATION ARRANGEMENTS OF** |
| **Company Restaurant**") | **HOULIHAN LOKEY HOWARD &** |
| | **ZUKIN CAPITAL PURSUANT TO** |
| Debtors and Debtors-in-Possession. | **BANKRUPTCY CODE SECTIONS 327(a)** |
| | **AND 328(a)** |
| Affects all three Debtors: __X__ | |
| | Hearing |
| Affects only: | |
| | Date:  October 22, 2004 |
| American Restaurant Group Inc. ____ | Time:  1:00 p.m. |
| | Place:  Courtroom 1345, Roybal Federal Bldg. |
| ARG Enterprises Inc. ____ | 255 East Temple Street |
| | Los Angeles, California |
| ARG Property Management Corp. ____ | |

LA1:#6289124

**EXHIBIT 2**

TO THE HONORABLE THOMAS B. DONOVAN, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE TWENTY LARGEST UNSECURED CREDITORS, AND OTHER PARTIES IN INTEREST AND THEIR COUNSEL OF RECORD:

American Restaurant Group, Inc. ("ARG"), ARG Enterprises, Inc. ("Enterprises"), and ARG Property Management Corporation ("APM"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this application (the "Application") for entry of an order authorizing the retention and employment of Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey") for the purposes of providing financial advisory and investment banking services in these chapter 11 cases, effective as of the Petition Date (as defined below), pursuant to sections 327, 328 and 330 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Bankruptcy Rules for the Central District of California (the "Local Rules"). The terms of Houlihan Lokey's retention are set forth in the engagement letter dated July 29, 2004, between the Debtors and Houlihan Lokey (the "Engagement Letter"), a true and correct copy of which is attached as Exhibit 1 to the Declaration of Peter S. Fishman filed in support hereof (the "Fishman Declaration") and incorporated herein by this reference.

## BACKGROUND

On September 28, 2004 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"). The Debtors continue to operate their business and manage their assets as debtors-in-possession, pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee, examiner or statutory committee of creditors has been appointed in this case.

### A.    The Debtors' Business and Brief History

The Debtors' principal business is the operation of a western-style steakhouse restaurant chain (the "Stuart Anderson's Black Angus Chain" or "Chain") that specializes in steak and prime rib. Originally founded in 1964, the Chain operates under the trade names: "Stuart Anderson's Restaurants," "Stuart Anderson's Black Angus" and "Stuart Anderson's

Cattle Company." ARG was formed in 1986 to acquire the Stuart Anderson's Black Angus Chain, as well as subsidiaries that operated non-Black Angus restaurants from Saga Corporation ("Saga"), a subsidiary of Marriott Corporation (the "Acquisition"). ARG and Saga completed the Acquisition in 1987. ARG has been operating the Stuart Anderson's Black Angus Chain since the Acquisition. In June 2000, ARG sold its stock in its subsidiaries operating the non-Stuart Anderson's Black Angus restaurants (Grandy's, Inc., Spoons Restaurants, Inc., Spectrum Foods, Inc., and Local Favorite, Inc., collectively, the "Non-Black Angus Subsidiaries") to Spectrum Restaurant Group, Inc. ("Spectrum").[1]

ARG, a Delaware corporation with corporate headquarters located in Los Altos, California, approximately thirty-five miles south of San Francisco, is the holding company of each of the remaining Debtors. Enterprises, a California corporation, is the operator of all of the restaurants in the Chain and is the primary operating entity among the Debtors' businesses. APM, also a California corporation, is lessee under certain leases of the Chain and owns the improvements performed at certain of the Chain locations. ARG is also the parent to ARG Terra, Inc. ("Terra"), a Delaware corporation that has no operating business. Terra was originally formed in 2000 to act as the provisional lessee under certain leases for Grandy's Inc., a Non-Black Angus subsidiary that was sold in 2000 and is no longer affiliated with the Debtors. Terra is not a debtor in these proceedings and has not filed for bankruptcy. Black Angus Enterprises of Idaho, a wholly owned subsidiary of Enterprises that, until recently, operated the

---

[1] Spectrum is a company that is controlled by Anwar S. Soliman, a former executive, former director, and former significant shareholder of the Debtors. The Spectrum sale resulted in, among other things, the Debtors' receipt of $17 million in cash, the transfer of certain assets and liabilities to Spectrum and the retention of certain assets and liabilities associated with certain closed restaurants. In 2003, the Debtors entered into an agreement with Spectrum that documented reimbursement, assumption, and indemnification obligations of Spectrum in connection with ARG's remaining liabilities related to the Non-Black Angus Subsidiaries. On August 6, 2003, Spectrum and its subsidiaries (collectively, the "SRG Group") each filed in United States Bankruptcy Court a voluntary petition for bankruptcy and reorganization under Chapter 11. Third parties have asserted claims against certain of the Debtors for the SRG Group obligations, including claims for obligations under certain leases rejected by the SRG Group in their bankruptcy cases. The Debtors believe that their liability on these claims ranges in the millions of dollars.

1  sole Stuart Anderson's Black Angus Chain location in the state of Idaho, also is not a debtor in
2  these proceedings.

3      The Stuart Anderson's Black Angus Chain as of the Petition Date consists of 93
4  restaurants operating primarily in California, the Pacific Northwest, Arizona and other Western
5  states.[2] The Debtors employ approximately 6,000 persons.

6  ## B.  Events Leading to Chapter 11 Filings

7      As of the Petition Date, the Debtors' principal liabilities and obligations consisted
8  of the following: (a) a $17.5 million revolving credit facility (and letter-of-credit facility) with
9  Wells Fargo Foothill, Inc. ("WFF"), the entire amount of which was outstanding as of the
10  Petition Date; (b) a $5 million term loan (the "ECF Loan") provided by TCW Shared
11  Opportunity Fund III, L.P. ("SHOP III"), of which all $5 million was outstanding as of the
12  Petition Date; (c) $161.8 million principal amount of 11½% Senior Secured Notes due 2006 (the
13  "Notes"); (d) approximately $2.1 million in additional long-term debt relating to mortgages and
14  capital leases for improvement and equipments; (e) trade, vendor and general unsecured claims
15  other than lease and executory contract claims in the amount of approximately $4 million; and (f)
16  lease and other executory contract contingent and rejection damage claims in an approximate
17  amount of approximately $10 million.

18      In 2001, the Debtors began to experience a prolonged downturn in their revenues
19  and profits, coinciding with the broader economic downturn in the United States that commenced
20  in years 2000 and 2001. The Debtors' economic performance worsened in each of fiscal years
21  2001, 2002 and 2003. Annual revenues of approximately $301.8 million in 2001 diminished to
22  $295.3 million in 2002, and to $276.6 million in 2003. Declines in annual operating profits
23  followed. Operating profits (losses) in fiscal years 2001, 2002 and 2003 were $13.9 million,
24  $18.8 million, and ($10.9) million, respectively.

25
26

---

27  [2] Prior to the Petition Date, the Debtors closed 12 of its unprofitable restaurant locations. The
    Debtors either already have surrendered or will surrender within the next few weeks the related
28  leaseholds to the respective landlords of those locations.

The deterioration in the Debtors' revenues and profits is attributable to several factors. The Debtors have been highly leveraged since acquiring the Stuart Anderson's Black Angus Chain and the Non-Black Angus Subsidiaries. Due to ongoing liquidity limitations within the highly leveraged capital structure, the Debtors have been unable to invest adequately in the type of ordinary-course maintenance and improvements that the Chain's facilities have required to remain competitive with rivals in the industry. The Debtors' ability to compete also suffered from the Debtors' inability to commit sufficient funds for broadcast-media advertising campaigns designed to maintain and even bolster the "Black Angus" brand. The Debtors' limited ability to improve its facilities and advertise led to waning same-store sales. In 2002, the Debtors experienced a 2.7% decline from 2001 sales levels. The Debtors experienced a 6.3% decline in sales from 2002 to 2003.

Soaring beef prices have further contributed to reduced profits. Beef represents the Debtors' leading food costs. Starting with the discovery in Canada of a cow infected with BSE (Bovine Spongiform Encephalopathy) in May 2003, which halted beef imports to the United States from Canada, and followed by the discovery of a cow infected with BSE in December 2003 in Washington, beef prices have witnessed unprecedented increases and fluctuations over the past fifteen months. Beef costs in 2003 increased 10.9% over 2002 levels.

On May 3, 2004, due to insufficient liquidity, the Debtors did not pay the $9.3 million semiannual interest payment then due on the Notes. Under the provisions of the trust indenture (the "Indenture") that governs the rights and obligations of the Debtors and the holders of the Notes (the "Noteholders"), the Debtors' grace period to cure the interest payment default terminated June 2, 2004. However, on or about June 1, an informal committee of the Noteholders, representing a majority of the outstanding Notes (the "Noteholders' Committee"), agreed to forbear from instructing BNY Western Trust Company, formerly known as U.S. Trust Company National Association, as trustee under the Indenture, to accelerate the Note debt and exercise remedies available under the Indenture.[3] The Noteholders' Committee employed

---

[3] WFF and SHOP III also agreed to forbear from acting upon certain defaults in respect of their loan agreements with the Debtors.

-4-

financial and legal advisors (the "Committee Advisors") to commence a due-diligence process that, in turn, led to a dialogue between the Debtors and the Noteholders' Committee regarding a consensual restructuring of the Debtors' capital structure ("Consensual Restructuring").

Prior to the Petition Date, the Debtors and the Noteholders' Committee, whose membership represents at least two-thirds of the outstanding principal amount of the Notes, reached agreement as to a Consensual Restructuring. Under the terms of this agreement, 100% of the Debtors' indebtedness under the Notes will be converted into substantially all of the equity of the reorganized Debtors through a pre-negotiated plan of reorganization (the "Consensual Plan") to be filed in the cases. The Debtors intend to file the Consensual Plan and its accompanying disclosure statement within the next several days.

### RELIEF REQUESTED

The Debtors desire to employ Houlihan Lokey as their financial advisor during the pendency of these cases, pursuant to Bankruptcy Code section 327(a), and to obtain approval of the terms under which Houlihan Lokey will be compensated at the expense of the Debtors, pursuant to Bankruptcy Code section 328(a), on the terms set forth in the Engagement Letter.

### HOULIHAN LOKEY AND ITS SERVICES

The Debtors require the services of an experienced financial advisor to assist and advise them in these chapter 11 cases. Houlihan Lokey is a nationally recognized investment banking/financial advisory firm with 9 offices and more than 400 professionals worldwide. Houlihan Lokey provides financial advisory services and execution capabilities in a variety of areas, including financial restructuring, where Houlihan Lokey is one of the leading advisors and investment bankers to debtors, bondholder groups, secured and unsecured creditors, acquirors, and other parties in interest involved in financially troubled companies, both in and outside of bankruptcy. Houlihan Lokey's Financial Restructuring Group has over 100 professionals dedicated to financial restructuring engagements.

As set forth in the Engagement Letter, the scope of Houlihan Lokey's retention includes:

a. assisting the Debtors in the development, preparation and distribution of selected information, documents and other materials necessary for the creation of interest in, and subsequent consummation of, any Transaction(s) (as defined in the Engagement Letter as a Restructuring, Financing or Sale Transaction); solicit and evaluate indications of interest and proposals regarding any Transaction(s); assisting the Debtors with the development, structuring, negotiation and implementation of any Transaction(s), including, among other things, participation, as a representative of the Debtors, in negotiations with creditors and other parties involved in any Transaction(s);

b. assisting the Debtors in valuing the Company and/or, as appropriate, valuing the Debtors' assets or operations; provided that any real estate or fixed asset appraisals will be undertaken by outside appraisers, separately retained and compensated by the Debtors;

c. providing expert advice and testimony regarding financial matters related to any Transaction(s), including, among other things, the feasibility of any Transaction, and the valuation of any securities issued in connection with any Transaction;

d. advising the Debtors regarding the availability of new debt and/or equity financing, mergers or acquisitions, and/or the sale or other disposition of any of the Debtors' assets or businesses;

e. as requested by the Debtors, developing a list of potential lenders, equity investors, and/or strategic partners (collectively, "Investors"), and interact with such Investors in an effort to create interest in Transaction(s) with the Debtors;

f. as requested by the Debtors, assisting the Debtors in the preparation of an appropriate offering memorandum to provide to Investors interested in Transaction(s) with the Debtors, and submit and discuss such offering memorandum with interested parties, and participate, as a representative of the Debtors, in the negotiation of Transaction(s) with interested parties;

g. assisting the Company with due-diligence investigations conducted in connection with any Transaction(s);

h. providing testimony in connection with the foregoing, if necessary; and

i. rendering, during the term of the Engagement Letter, such additional financial advisory and investment banking services, the identity and compensation for which shall be mutually agreed upon by Houlihan Lokey and the Debtors.

Since its retention pursuant to the Engagement Letter, Houlihan Lokey has been instrumental in assisting the Debtors, and their management and board, on numerous matters, including reviewing and analyzing the Debtors' business, operations and financial projections, evaluating the Debtors' liquidity and short-term cash flows, evaluating the Debtors' potential debt capacity in light of its projected cash flows, evaluating various out-of-court and in-court

1  restructuring alternatives, and negotiating with the Debtors' creditors regarding these

2  alternatives.

3         The Debtors' estates have benefited from Houlihan Lokey's work to date, and will

4  continue to benefit from Houlihan Lokey's services in assisting the Debtors throughout these

5  proceedings.

6         All professionals comprising or associated with Houlihan Lokey who will render

7  services to the Debtors have experience in providing the aforementioned services to business

8  entities, both in and out of bankruptcy, and their individual biographies are attached to the

9  Fishman Declaration as Exhibit 2.

10                      **Houlihan Lokey's Compensation**

11         By this Application, the Debtors request approval of the terms of compensation to

12  Houlihan Lokey set forth in detail in the Engagement Letter. As provided therein, Houlihan

13  Lokey will be paid $125,000 per month (the "Monthly Fee") for the services to be provided

14  pursuant to the Engagement Letter. In addition to the Monthly Fee, the Engagement Letter

15  provides that Houlihan Lokey is to receive the following compensation (all as more fully

16  described in the Engagement Letter and with capitalized terms having the meanings ascribed to

17  such terms in the Engagement Letter):

18     a.  Restructuring Transaction Fee ("Restructuring Transaction Fee"). Upon the
           effective date of a confirmed plan of reorganization under Chapter 11 of the
19         Bankruptcy Code, which constitutes a Restructuring Transaction, Houlihan
           Lokey shall earn, and the Debtors shall promptly pay to Houlihan Lokey, a
20         Transaction Fee of $750,000;

21     b.  Financing Transaction Fee ("Financing Transaction Fee"). If, and to the
           extent that, the Debtors have requested Houlihan Lokey to seek or obtain a
22         commitment to provide a Financing Transaction, Houlihan Lokey shall earn a
           Financing Transaction Fee equal to the sum of: (i) 1% of the aggregate
23         principal amount of all senior secured debt raised or committed; (ii) 3% of the
           aggregate principal amount of all other debt raised or committed; and (iii) 5%
24         of the aggregate amount of all equity and equity equivalents (including
           convertible securities and preferred stock) placed or committed.
25         Notwithstanding the foregoing, no Financing Transaction Fee shall be earned
           or paid in connection with (i) any Debtor-in-Possession facility obtained by
26         the Debtors from Wells Fargo Foothill, or any other existing creditor of the
           Debtors, or any affiliate of such creditor, and (ii) any financing obtained in
27         connection with the implementation of a Restructuring Transaction, to the
           extent that (a) Houlihan Lokey has not gone into the market to seek to obtain
28

LA1:#6289124                                    -7-

such financing, and (b) such financing is provided by the Debtors' existing lenders or Noteholders;

c. Sale Transaction Fee ("Sale Transaction Fee"). If, and to the extent that, the Debtors have requested Houlihan Lokey to seek a Sale Transaction, concurrently with the close of each Sale Transaction, Houlihan Lokey shall earn, and the Debtors shall thereupon pay immediately and directly from the proceeds of such Sale Transaction, as a cost of sale, a Transaction Fee in an amount to be negotiated in good faith between the Debtors and Houlihan Lokey, and approved by the Bankruptcy Court; and

d. Reimbursement of Houlihan Lokey's out-of-pocket expenses incurred in connection with its services under the Engagement Letter.

Prior to the Petition Date, Houlihan Lokey received two installments of its monthly retainer totaling $250,000 pursuant to the Engagement Letter, plus reimbursement of expenses totaling $2,535.69.

### Disinterestedness

To the best of the Debtors' knowledge, and based upon the annexed Fishman Declaration, neither Houlihan Lokey, nor any of its shareholders, has any connection with the Debtors, any creditors of these estates, any parties in interest, its attorneys or accountants, any bankruptcy judge of this Court, the United States Trustee or any person employed in the Office of the United States Trustee, that would in any way render Houlihan Lokey not disinterested under the Bankruptcy Code, except as described therein.

The following supplemental disclosures are made in lieu of the Bankruptcy Court's optional Form 2014-1, entitled "Statement of Disinterestesness for Employment of Professional Person under F.R.B.P. 2014." References to Houlihan Lokey include all members who are expected to render services in this case:

a. Houlihan Lokey does not hold a prepetition claim against the Debtors' estate.

b. Houlihan Lokey is not and was not an equity security holder, or an insider of the Debtors.

c. Houlihan Lokey is not and was not an investment banker for any outstanding security of the Debtors.

d. Houlihan Lokey is not and was not, within three years before the Petition Date, an investment banker for a security of the Debtors or an attorney for such investment banker in connection with the offer, sale or issuance of any security of the Debtors.

e. Houlihan Lokey is not and was not, within two years before the Petition Date, a director, officer or employee of the Debtors, or of any investment banker for the security of the Debtors.

f. Subject to the disclosures contained in the Fishman Declaration, Houlihan Lokey has no interest adverse to the interests of the estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors or an investment banker for any security of the Debtors or for any other reason.

g. On October 30, 2003, Houlihan Lokey rendered an opinion as to the fairness, from a financial point of view, of the financial terms of the loan agreement entered into by the Debtors with SHOP III.

h. The name, address and phone number of the person signing on behalf of Houlihan Lokey and the relationship of such person to Houlihan Lokey are listed in the signature block of the attached Fishman Declaration.

### Approval Of Compensation Arrangements

Bankruptcy Code section 328(a) provides in pertinent part that:

> a. The trustee, or a Debtor appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. . . .

11 U.S.C. § 328(a).

By this Application, the Debtors request that the Court approve the above-described compensation arrangements, pursuant to Bankruptcy Code section 328(a). The

1  compensation arrangements contained in the Engagement Letter are highly beneficial to the

2  Debtors' estates, as they provide certainty and proper inducement for Houlihan Lokey to act

3  expeditiously and prudently.

4          Pursuant to Local Rule 2014-1(b)(1) and the United States Trustee Guidelines, the

5  Debtors have filed this Application directly with the Court. The Debtors have served notice of

6  the hearing on the Application, along with copies of the Application and the Fishman

7  Declaration, on the Office of the United States Trustee, the Debtors' 20 largest unsecured

8  creditors, and the principal secured and unsecured creditors in these cases.

12                    *[Remainder of page intentionally left blank.]*

## Request for Relief

Based on the facts and disclosures above, the Debtors respectfully request authority to employ and retain Houlihan Lokey and its various principals and employees as their financial advisor as of the Petition Date, that the Court approve the terms of employment set forth in the Engagement Letter, that the Court approve the compensation of Houlihan Lokey at the expense of the Debtors' estates, on the terms set forth in the Engagement Letter, and that, in light of the services to be provided by Houlihan Lokey, and the structure of Houlihan Lokey's compensation pursuant to the Engagement Letter, Houlihan Lokey be excused from maintaining time records with respect to the services to be rendered by Houlihan Lokey in these cases.

Dated: October 5, 2004          AMERICAN RESTAURANT GROUP, INC., et al.
                                Debtors and Debtors-in-Possession


By: Patrick J. Kelvie
Title: Vice President/General Counsel

Robert Jay Moore (#77495)
Thomas R. Kreller (#161922)
David B. Zolkin (#155410)
Haig M. Maghakian (#221954)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4000
Facsimile: (213) 629-5063

Attorneys for American Restaurant Group, Inc., et al.
Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>**AMERICAN RESTAURANT GROUP, INC.**, a Delaware corporation; **ARG ENTERPRISES, INC.**, a California corporation; **ARG PROPERTY MANAGEMENT CORPORATION**, a California corporation,<br><br>(commonly known as **"Stuart Anderson's Black Angus Restaurants"** or **"Stuart Anderson's Cattle Company Restaurants"**)<br><br>Debtors and Debtors-in-Possession.<br><br>――――――――――――――<br><br>Affects all three Debtors: _X_<br><br>Affects only:<br><br>American Restaurant Group Inc. ____<br><br>ARG Enterprises Inc. ____<br><br>ARG Property Management Corp. ____<br><br>――――――――――――――| Case Nos.  LA 04-30732 TD<br>             LA 04-30734 TD<br>             LA 04-30736 TD<br><br>Jointly Administered Under<br>Case No. LA 04-30732 TD<br><br>Chapter 11 Cases<br><br>**DEBTORS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF APPLICATION TO EMPLOY HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC. AS FINANCIAL ADVISOR AND INVESTMENT BANKER FOR THE DEBTORS; DECLARATIONS OF WILLIAM TAVES AND ANDREW MILLER IN SUPPORT THEREOF**<br><br>**Hearing:**<br><br>Date:  November 1, 2004<br>Time:  2:00 p.m.<br>Place:  Courtroom 1345<br>         Roybal Federal Bldg.<br>         255 E. Temple Street<br>         Los Angeles, CA |

/ / /

/ / /

LA1:#6291763v2

**EXHIBIT 3**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit this supplemental memorandum (the "Memorandum"): (a) in support of the Debtors' application to employ and retain Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan") as their financial advisor and investment banker in these chapter 11 cases (the "Houlihan Application"); and (b) in response to the objections to the Houlihan Application filed by the Office of the United States Trustee (the "UST") and the Official Committee of Unsecured Creditors (the "Committee") (the "UST Objection" and the "Committee Objection," respectively).

## I.    Introduction.

The Houlihan Application requests that the Court authorize the Debtors to engage Houlihan, in accordance with the terms of the engagement letter attached to the Houlihan Application as Exhibit "1" thereto (the "Houlihan Engagement Letter"), to provide a wide range of financial advisory and investment banking services that will be integral to the Debtors' ability to successfully and promptly emerge from these chapter 11 cases in a manner that maximizes value for all of the Debtors' economic stakeholders. While Houlihan has already played a key role — both prepetition and postpetition — in helping the Debtors develop a game plan for a value-maximizing reorganization, the Debtors believe that Houlihan's ongoing involvement throughout the chapter 11 cases will be even more important as the Debtors strive to implement that game plan through the Debtors' proposed plan of reorganization.

The UST and the Committee have objected to the Houlihan Application on a variety of grounds. Notably, neither the UST nor the Committee assert that the Debtors do not need sophisticated financial advisory services or are not entitled to the services of a financial advisor of their own choosing. Indeed, one would be hard pressed to identify any case of a similar magnitude in which a debtor did not require a financial advisor to provide precisely the type of services to be provided by Houlihan. Rather, both the UST Objection and the Committee Objection target specific terms of the proposed retention, as opposed to arguing that the retention of Houlihan itself is unnecessary. As set forth below, the objections by the UST and the Committee to specific terms of the proposed Houlihan retention are either: (a) the result of a

1  misunderstanding or mischaracterization of the Houlihan Application; or (b) legally or factually

2  flawed.

3  **II.   The Houlihan Application Is A Straightforward Request Under
       Bankruptcy Code Section 328(a), Not An Attempt To Circumvent**

4  **Fee Application Requirements Or Bankruptcy Court Oversight.**

5         As a threshold matter, both the UST and the Committee misinterpret the Houlihan

6  Application, characterizing it as an attempt to "circumvent the Bankruptcy Code's oversight and

7  reporting provisions regarding the employment and compensation of professionals."  Committee

8  Objection at p.2.  <u>See also</u> UST Objection at pp. 2-3.

9         To the contrary, the Houlihan Application is nothing more than a straightforward

10  request that the Court approve Houlihan's employment under the express provisions of

11  Bankruptcy Code section 328(a).  Section 328(a) provides in pertinent part that, with court

12  approval, a debtor in possession may:

13         employ . . . a professional person . . . <u>on any reasonable terms and
              conditions</u> of employment, including on a retainer, on an hourly

14         basis, or on a contingent fee basis.  <u>Notwithstanding such terms
              and conditions, the court may allow compensation different from</u>

15         <u>the compensation provided under such terms and conditions after
              the conclusion of such employment,</u> if such terms and conditions

16         prove to have been improvident in light of developments not
              capable of being anticipated at the time of the fixing of such terms

17         and conditions.

18  11 U.S.C. §328(a) (emphasis added).

19         Court supervision of actual compensation to a professional employed under

20  section 328(a) is inherent within the express provisions of that section.  Nothing in the Houlihan

21  Application suggests that Houlihan or the Debtors are seeking to circumvent that oversight.  To

22  the contrary, the Debtors' request to employ Houlihan pursuant to section 328(a) is an implicit

23  acknowledgment of the restrictions inherent in section 328(a).

24         To be perfectly clear, Houlihan has advised the Debtors that Houlihan: (a)

25  understands and acknowledges that its compensation will be subject to review by the Court in

26  accordance with the standards set forth under section 328(a); and (b) will file interim and final

27  fee applications which shall include time records describing generally the services rendered and

28  setting forth the name of the individuals rendering such services in half-hour increments, as well

as records identifying the costs and expenses (including attorneys fees) for which Houlihan will

seek reimbursement pursuant to its engagement letter.[1]

### III. The Houlihan Application Falls Squarely Within The Policies And Parameters Underlying Section 328(a).

As described in more detail below, courts increasingly have used section 328(a) to

approve employment arrangements for financial advisors, especially where, as here, the financial

advisors have assisted debtors in either pre-negotiated or pre-packaged plans or in extensive pre-

bankruptcy planning. Section 328(a) is particularly well suited to these types of situations,

because it give the debtor the benefit of the ongoing services of sophisticated, expert advisors,

while at the same time permitting the debtor to incentivize the advisor with a "back-end" fee that

motivates the advisor to see the transaction through to completion.

Thus, the increasing use of section 328(a) by courts fosters several important

policies underlying the Bankruptcy Code; including (a) the general policy favoring

reorganization over liquidation is best served if a debtor can employ qualified professionals to

conduct extensive, thoughtful and well-reasoned planning prior to the filing of a chapter 11 case,

and (b) the policy that distressed debtors should have access to professional advisors of the

highest quality to assist in what can be very trying times.

It is with these policies in mind that Bankruptcy Code section 328(a) imposes no

rigid parameters regarding acceptable terms and conditions of employment, but rather simply

requires that they be "reasonable." As the court in In re Niover Bagels, Inc., 214 B.R. 291, 294

(Bankr. E.D.N.Y. 1997), aptly noted, the "flexibility written into [section 328(a)] encourages

---

[1] The UST Objection asserts that the provision in the Houlihan Engagement Letter requiring the Debtors to reimburse Houlihan for attorneys fees and costs incurred by Houlihan similarly is an attempt to circumvent the disclosure and reporting requirements contained in the Bankruptcy Code. To the contrary, the reimbursement provision expressly limits the Debtors' obligations to reimburse Houlihan for attorneys fees to only those amounts of attorneys fees that constitute "out-of-pocket expenses reasonably incurred" by Houlihan. Inherent in this "reasonableness" limitation is a standard of review to be afforded to both the Debtors and to the Court through the fee application process. Once again, the Debtors and Houlihan expressly acknowledge that any costs and expenses incurred by Houlihan for which Houlihan seeks reimbursement under the Houlihan Engagement Letter will be subject to the review of the Debtors and the Court in accordance with the fee application process.

1  bankruptcy judges to approve compensation agreements that reflect market conditions and to

2  fashion arrangements suitable to the circumstances before it." (Emphasis added.)

3          In this regard, "[s]ection 328(a) effects a significant departure from prior practice

4  under the Bankruptcy Act in which professionals were entitled to reasonable compensation

5  determined on a strictly *quantum merit* basis." 3 Collier on Bankruptcy (15th ed. rev., ¶328.02 at

6  328-4. Thus, section 328(a) provides the Court with an alternative to the standards set forth in

7  Bankruptcy Code section 330 where circumstances warrant. Interestingly, both the UST and the

8  Committee completely ignore the express provisions of section 328(a) available to the Court,

9  choosing instead to cite only to section 330 (UST Objection at p. 2; Committee Objection at p.

10  5). As set forth below, notwithstanding the UST's and the Committee's failure to acknowledge

11  the existence of section 328(a), courts around the country have used precisely that provision to

12  craft employment and compensation arrangements for financial advisors in comparable

13  situations.

14          Factors considered by courts in determining what is "reasonable" under section

15  328(a) include, but are not limited to, (a) whether the terms are common business terms in the

16  marketplace, (b) whether the retention, as proposed, is in the best interest of the debtor's estate,

17  and (c) whether the terms are a product of arms-length negotiations between sophisticated

18  parties. See In re Niover Bagels, Inc., 214 B.R. at 294;   In re Insilco Technologies, Inc., et al.,

19  291 B.R. 628, 634 (Bankr. D. Del. 2003). In these cases, each of these factors weighs heavily in

20  favor of approval of the Houlihan Application.

21        **A.**    **The Proposed Terms of Houlihan's Engagement**
               **Are Common Business Terms In The Marketplace.**

22

23          The Houlihan Application requests that the Court authorize the Debtors to

24  compensate Houlihan through a monthly fee of $125,000, plus a "back-end" Restructuring

25  Transaction Fee of $750,000. This structure – a monthly fee coupled with a "transaction"

26  payable when a transaction is successfully completed – is by far the most common structure used

27  in employing financial advisors/investment bankers in distressed situations. The structure

28  provides the professional with interim monthly compensation (such that the professional does not

find itself "financing the case"), while at the same time "back-ending" a large portion of the compensation to provide proper incentive to achieve a successful transaction. In many respects, this hybrid structure is a combination of the "retainer" and "contingent fee" structures that are expressly contemplated by section 328(a).

Attached as Exhibit 1 to the accompanying Declaration of Andrew Miller (the "Miller Declaration") is a table summarizing 25 recent or ongoing restructurings of companies of a comparable size as the Debtors. The table indicates that in each of the 25 restructurings, the debtor (either in court or out of court): (a) engaged a financial advisor; (b) agreed to pay the financial advisor a flat monthly fee that, on average, exceeded $125,000; and (c) agreed to pay the financial advisor a transaction fee ranging from 0.4% of the total pre-restructuring debt to 2.0% of the total pre-restructuring debt. In addition, the table indicates that, in <u>all</u> 18 of the identified transactions that involved bankruptcy filings, employment of the financial advisor was granted under section 328(a). The information summarized in the table makes clear that the proposed engagement of Houlihan falls well within the "common business terms" of the applicable marketplace.[2]

In fact, the Debtors believe that the terms of the proposed Houlihan engagement are actually at the low end of "market" and therefore may be less expensive to the Debtors than the terms that the Debtors might be confronted with if forced to seek a replacement. For example, the average transaction fee for those restructurings identified on Exhibit 1 compute to 1.1% of the estimated total amount of prepetition debt for cases involving between $100 million and $250 million of prepetition debt. In contrast, Houlihan's proposed transaction fee would equal just 0.4% of the estimated total amount of the Debtors' prepetition debt. Applying the 1.1% average in this case would result in a transaction fee of $2.31 million, as compared to the $750,000 fee the Debtors have negotiated with Houlihan. Based upon this information and on the Debtors' interviews of other financial advisory firms, the Debtors believe the terms of Houlihan's engagement are reasonable.

---

[2]     Indeed, Ernst & Young Corporate Finance, the Committee's financial advisor, made a proposal to serve as the Debtors' financial advisor that consisted of a flat monthly fee very similar to that proposed by Houlihan, coupled with a "success fee" that was identical to the "restructuring transaction fee" proposed in the Houlihan Application.

### B.    The Retention Of Houlihan Is In The Best Interests Of The Estate.

There can be no question that the Debtors' continued retention of Houlihan is in the best interests of the estate for a variety of reasons. <u>First</u>, contrary to the assertions by the Committee that Houlihan's valuation work is complete and there is no "future value" for Houlihan to provide, Houlihan's real value to the Debtors is yet to come. While it is true that Houlihan has already played a key role in assisting the Debtors to develop a "game plan," Houlihan's services and expertise will be absolutely critical going forward as the Debtors now push forward to implement that game plan. Undoubtedly, "the devil is in the details." Among other things, the Debtors believe they will need Houlihan to perform all of the following services:

#### Advise ARG's Board of Directors and Management

- Continue to advise ARG's Board with regard to strategic alternatives, strategies, and other issues related to the Chapter 11 case, including those arising from Committee objections.

- Advise management with regard to Chapter 11 related issues, including those arising from Committee objections.

#### Plan Negotiations

- Facilitate negotiations among the Debtors' constituents regarding the terms of the Plan of Reorganization ("Plan"). In particular, assist in negotiations and provide information and analysis with respect to appropriate value allocation among the constituents and type of consideration (i.e., debt, equity or cash) to provided to creditors.

- If required, negotiate revised DIP/exit financing terms with Wells Fargo Foothill.

#### Expert Testimony

- Provide testimony, if necessary, on various issues, including, but not limited to, valuation, debt capacity, unencumbered asset valuation, liquidation analysis, DIP/exit financing, plan feasibility and fairness, etc.

#### Plan and Disclosure Statement Preparation/Modification

- Wrote Valuation Analysis and Liquidation Analysis sections of Disclosure Statement.

- Prepared exhibits for Liquidation Analysis section and plan recoveries section of Disclosure Statement.

- Reviewed and provided edits to Plan and Disclosure Statement.

- Modify Liquidation Analysis section and/or recoveries charts, as required.

- Review and provide edits to amendments or modifications to the Plan and Disclosure Statement.

## Valuation

- Review and revise going concern valuation and liquidation valuation, if necessary, to reflect events during the pendency of the bankruptcy case.

  - Impact of North Scottsdale delay.

  - Impact of delay in the bankruptcy case.

- Review any revisions to the Debtors' business plan and the impact of such changes to value.

- Revise the trading multiples of the comparable companies to reflect new information.

- Evaluate the Debtors' ability to retain and utilize its significant tax attributes. Assessing the benefit of any such attributes on the Debtors' business plan and long-term cash flow.

## Unencumbered Asset Valuation

- Review and revise unencumbered asset valuation to reflect events during the pendency of the bankruptcy case.

## Facilitate Due Diligence for Secured Noteholder, Committee and Other Advisors

- Participated in due diligence sessions with Committee advisors and Secured Noteholder advisors. Prepared due diligence package/presentation for Committee advisors and Secured Noteholder advisors.

- Continue to facilitate the due diligence process of the Secured Noteholder, Committee and other advisors retained in the case, specifically with respect to (i) valuation, (ii) unencumbered asset valuation, (iii) debt capacity, (iv) liquidation analysis, and (v) thoughts and observations on the business plan, among others.

## Financial Analysis

- Monitor weekly/monthly financial information provided by the Debtors.

- Analyze the weekly/monthly financial statements of the Debtors, including, but not limited to, (i) external income statements, cash flow statements and balance sheets, (ii) internal financial reporting packages, (iii) monthly operating reports, and (iv) the 13-week cash flow forecast. Update valuation, liquidity, debt capacity, and other analyses to reflect information included in such statements.

## Claims Resolution

- Assist with the claim resolution process.

- Update the recovery analysis to reflect revised estimates of claims or revised valuation conclusions (going concern and/or liquidation).

**Exit Financing**

- Contact other potential lenders with the opportunity of providing an exit financing facility.

- Negotiate final documentation of exit financing facility, including assessing the appropriateness of various financial covenants associated with the exit financing facility.

- Assess the debt capacity of the Debtors based on revisions to the business plan and/or financial performance during the pendency of the bankruptcy case.

**External Communication**

- Advise Company with regard to press releases associated with Chapter 11 related issues or events.

- Explain to Secured Noteholders and other stakeholders on an unrestricted basis the (i) economics underlying the plan of reorganization, and (ii) trends and facts associated with the Debtors' monthly operating reports, among other things.

**Plan Alternatives**

- Respond to all inquiries regarding possible Plan alternatives, including possible third-party investment and sale alternatives.

Second, neither the Committee nor the UST dispute that the Debtors require a financial advisor to assist them in their efforts to proceed through these cases and to implement their pre-negotiated plan of reorganization. Thus, if for some reason Houlihan is not employed as the Debtors' financial advisor, the Debtors would be forced to engage another, firm to provide those services – presumably on terms that would end up being substantially similar to the terms of the proposed Houlihan engagement. Consequently, denial of the Houlihan Application would impose on the estates the additional cost, delay and disruption associated with the hiring (and education) of a new financial advisor – all to no apparent end.

C.    **The Terms Of Houlihan's Engagement Are A Product Of Arms-Length Negotiation Between Sophisticated Parties.**

As described in the Declaration of William Taves, prior to selecting Houlihan, the Debtors considered and interviewed a number of other candidates for the role of financial advisor

to the Debtors. The Debtors engaged in arms-length discussions with all of the candidates, including Houlihan. In fact, the Debtors selected Houlihan as one of the two most qualified candidates, but Houlihan's original compensation proposal was higher than the proposal the Debtors received from its competitor. The Debtors then offered Houlihan the engagement on the condition that Houlihan reduce its proposal to essentially "match" the Debtors' other bid. Houlihan ultimately agreed to do so, and that reduced fee structure is what is reflected in the Houlihan Engagement Letter.

In addition, the ad hoc committee of the Debtors' secured noteholders also reviewed the Debtors' selection of Houlihan and the proposed terms of Houlihan's engagement and consented thereto. Accordingly, the terms of Houlihan's engagement are the product of arms-length negotiation between Houlihan and the Debtors, with the added oversight of the as hoc committee of secured noteholders.

**IV.    The Proposed Indemnification Provisions Are Ordinary, Customary And Appropriate Under Section 328(a).**

In the UST Objection, the UST objects to a portion of the indemnification provisions contained in the Houlihan engagement letter. As a threshold matter, the Debtors believe that the UST's objection to the indemnification provisions should be overruled because the indemnification provisions contained in Houlihan's engagement letter are ordinary, customary and appropriate under section 328(a). As discussed above, Bankruptcy Code section 328(a) imposes no rigid parameters regarding acceptable terms and conditions of employment, but rather simply requires that they be "reasonable." Factors considered by courts in determining what is "reasonable" include whether the terms are common business terms in the marketplace.

In the context of indemnification provisions, courts have regularly approved the retention of professionals subject to the indemnification provisions substantially similar to the ones at issue here. See, e.g., In re LTV Steel Company, Inc., et al., 2001 U.S. Dist. LEXIS 25338 (N.D. Ohio 2001); In re Bugle Boy, Ind., Inc., (Case No. 00-10834) (Bankr. C.D. Cal. 2001); In re Horizon Natural Resources Company, et al., Case No. 02-14261 (Bankr. E.D. Ky. 2002); In re Pittsburgh-Canfield Corp., Case Nos. 00-43394 through 00-43402 (Judge William T. Bodoh)

(Bankr. N.D. Ohio Dec. 12, 2000); In re EWI, Inc., 208 B.R. 885 (Judge James H. Williams) (Bankr. N.D. Ohio May 8, 1997); In re Phar-Mor, Inc., Case No. 92-41599 (Judge William T. Bodoh) (Bankr. N.D. Ohio Feb. 10, 1994); In re United Artists Theatre Co., 315 F.3d 217 (3d Cir. 2003); In re FV Steel and Wire Company, et al., Case No. 04-22421 (SVK) (Bankr. E.D. Wis. April 21, 2004); In re Fleming Companies, Inc., et al, Case No. 03-10945 (MFW) (Bankr. D. Del. Sept. 2, 2003); In re UAL Corporation, et al., Case No. 02-B-48191 (ERW) (Bankr. N.D. Ill. Dec. 30, 2002); In re Joan & David Halpern, Inc., 248 B.R. 43 (Bankr. S.D.N.Y. 2000), aff'd, 2000 WL 180060 (S.D.N.Y. 2000); In re Ameriserve Food Distribution, Inc., Case No. 00-0358 (PJW) (Bankr. D. Del. May 9, 2000); In re Tultex Corporation, et al., Case No. 99-03626 (Bankr. W.D. Va. 1999); In the Matter of The Score Board, Inc., Case No. 98-12555 (Bankr. D.N.J. 1998).

The court's approach in LTV Steel Company is illustrative of how many courts have come to analyze indemnification provisions in this context. In that case, the debtors applied to retain Jay Alix & Associates ("JA&A") as their business consultant and crisis manager. The retention agreement between the debtors and JA&A included a provision requiring the debtors to indemnify JA&A for any costs and expenses related to JA&A's services, except where JA&A was found to be grossly negligent or engaged in willful misconduct. Id. at *8. The district court analyzed the language of section 328 of the Bankruptcy Code and the relevant case law, and found that "provisions for indemnification of professionals in bankruptcy cases are not prohibited if the terms are favorable or reasonable." Id. "In deciding whether the terms of [a] professional's employment is reasonable, the court must consider whether the terms are fair to the professional, the debtor, and the creditors who must bear the expense." Id. at *5 (citing In re Truong, 259 B.R. 264, 268 (Bankr. D. N.J. 2001). Adopting this case specific approach, the district court noted that the indemnification provisions properly carved out gross negligence and willful misconduct. The district court also found that JA&A was a leading global turnaround specialist with extensive experience and expertise in advising and providing services to financially distressed companies. Id. at *10. The district court further noted that JA&A was familiar with the debtors' financial affairs and always seeks indemnification provisions in its

1    engagements. Id. Under the circumstances presented, the district court held that the

2    indemnification provision was a fair and reasonable term of employment under section 328 of

3    the Bankruptcy Code and in the best interest of the estate. Id. at *11.

4           Turning to the UST's specific objection:

5                  The United States Trustee objects to the terms of indemnification
                   requested by [Houlihan] which, in pertinent part, limits Houlihan
6                  Lokey's liability from gross negligence or willful misconduct to no
                   more than the fees received by Houlihan Lokey . . .
7
                   Should such an occurrence actually materialize resulting in
8                  Houlihan Lokey indemnifying the estate, the Debtors would have
                   to bear the excess over and above the fees received by Houlihan
9                  Lokey in this case.

10   UST Objection at pp. 1-2 (emphasis added).

11          The UST's argument in this regard simply misinterprets the Houlihan

12   Engagement Letter. There is nothing in the Houlihan Engagement Letter that would result in

13   Houlihan indemnifying the estates — rather, the indemnification provisions relate solely to the

14   Debtors' obligations to indemnify Houlihan. If the Debtors for any reason find themselves with

15   claims to assert against Houlihan, the indemnification provisions in the Houlihan Engagement

16   Letter will not even be implicated — the parties will have whatever rights they have at law,

17   without regard to any purported indemnification of the Debtors by Houlihan. Consequently, the

18   UST's objection in this regard is simply misplaced.

19   **V.     Upon Approval Of The Houlihan Application, Houlihan
             Will Not Be A Prepetition Creditor Of The Debtors.**
20

21          The Committee Objection asserts that the existence of the Houlihan Engagement

22   Letter as a prepetition contract results in Houlihan having contingent prepetition claims against

23   the Debtors. On that basis, the Committee Objection asserts that Houlihan is not disinterested

24   and therefore cannot be employed by the Debtors. This argument is nothing more than a "red

25   herring" that ignores several key points.

26          First and fundamentally, the mere existence of a prepetition engagement contract

27   obligating a debtor to pay the fees of a professional for services rendered cannot disqualify the

28   professional from being employed by the estate. If that were the case, a debtor could never

1 employ its prepetition professionals once it filed. Every prepetition engagement contract creates
2 a contingent obligation of the debtor to pay the fees of the professional – with the most notable
3 contingency being that the bankruptcy court must approve the employment of the professional.
4 Conceptually, right up until the moment the bankruptcy court approves the professional's
5 employment, every professional is a contingent creditor and therefore is not disinterested. As
6 soon as the professional's employment is approved, the professional no longer holds any
7 prepetition claim, but rather becomes an administrative creditor that is disinterested.

8        Second, as discussed in detail above, section 328(a) expressly grants courts great
9 latitude in approving compensation arrangements, as long as such arrangements are reasonable.
10 Section 328(a) is particularly well suited for use in the context of a pre-negotiated plan, because
11 it permits the debtor to utilize the expert services of qualified professionals to conduct extensive
12 negotiations with stakeholders prior to the bankruptcy filing, with a view towards ensuring that
13 the bankruptcy filing itself creates a minimal amount of disruption for the business enterprise.
14 The fundamental policies in favor of reorganization and the maximization of value require that
15 such efforts be rewarded, not punished, and that courts approve reasonable compensation
16 arrangements to the extent they are consistent with and facilitate those important policies.

17 **VI.  Conclusion.**

18        For all of the reasons set forth above, the Debtors respectfully request that the
19 Court overrule the Committee Objection and the UST Objection and enter an order approving the
20 Houlihan Application.

21 Dated: October 27, 2004        **MILBANK TWEED HADLEY & McCLOY** LLP
22
23        By: _____
           Thomas R. Kreller
24
25        Attorneys for  American Restaurant Group, Inc.
       Debtors and Debtors-in-Possession
26
27
28

## DECLARATION OF WILLIAM G. TAVES

I, William G. Taves, declare as follows:

1.     I am over eighteen years of age and, if called as a witness, I could and would testify competently to the matters set forth herein from my own personal knowledge, except as expressly noted otherwise.

2.     I am Certified Public Accountant, on inactive status. I am the Chief Financial Officer (the "CFO") of American Restaurant Group, Inc., a Delaware corporation ("ARG"), ARG Enterprises, Inc., a California corporation ("Enterprises") and ARG Property Management Corporation, a California corporation ("APM"), debtors and debtors-in-possession in the above-captioned chapter 11 bankruptcy cases (collectively, the "Debtors"). I am familiar with the Debtors' day-to-day operations, business affairs and financial condition and with the facts and circumstances surrounding a number of key operational and strategic issues. In addition, I was personally involved and participated in all material respects in the process whereby the Debtors interviewed candidates to serve as the Debtors' financial advisors and selected Houlihan Lokey Howard & Zukin, Inc. ("Houlihan") to fill that role.

3.     The Houlihan Application requests that the Court authorize the Debtors to engage Houlihan to provide a wide range of financial advisory and investment banking services that will be integral to the Debtors' ability to successfully and promptly emerge from these chapter 11 cases in a manner that maximizes value for all of the Debtors' economic stakeholders. While Houlihan has already played a key role — both prepetition and postpetition — in helping the Debtors develop a game plan for a value-maximizing reorganization, the Debtors believe that Houlihan's ongoing involvement throughout the chapter 11 cases will be even more important as the Debtors strive to implement that game plan through the Debtors' proposed plan of reorganization.

4.     The Debtors believe that the terms of the proposed Houlihan engagement are reasonable and actually are at the low end of "market," such that Houlihan's engagement may be less expensive to the Debtors than the terms that the Debtors might be confronted with if

1   forced to seek a replacement. Specifically, based upon the Debtors' interviews of other financial

2   advisory firms, the Debtors believe the terms of Houlihan's engagement are reasonable.

3   Specifically, to selecting Houlihan, the Debtors considered and interviewed a number of other

4   candidates for the role of financial advisor to the Debtors. The Debtors engaged in arms-length

5   discussions with all of the candidates, including Houlihan. In fact, the Debtors selected

6   Houlihan as one of the two most qualified candidates, but Houlihan's original compensation

7   proposal was higher than the proposal the Debtors received from its competitor. The Debtors

8   then offered Houlihan the engagement on the condition that Houlihan reduce its proposal to

9   essentially "match" the Debtors' other bid. Houlihan ultimately agreed to do so, and that

10  reduced fee structure is what is reflected in the Houlihan Engagement Letter.

11          5.      The Debtors believe that their continued retention of Houlihan is in the

12  best interests of the estate for a variety of reasons. Houlihan's services and expertise will be

13  absolutely critical going forward as the Debtors now push forward to implement that game plan.

14  Among other things, the Debtors believe they will need Houlihan to perform all of the following

15  services:

**Advise ARG's Board of Directors and Management**

- Continue to advise ARG's Board with regard to strategic alternatives, strategies, and other issues related to the Chapter 11 case, including those arising from Committee objections.

- Advise management with regard to Chapter 11 related issues, including those arising from Committee objections.

**Plan Negotiations**

- Facilitate negotiations among the Debtors' constituents regarding the terms of the Plan of Reorganization ("Plan"). In particular, assist in negotiations and provide information and analysis with respect to appropriate value allocation among the constituents and type of consideration (i.e., debt, equity or cash) to provided to creditors.

- If required, negotiate revised DIP/exit financing terms with Wells Fargo Foothill.

**Expert Testimony**

- Provide testimony, if necessary, on various issues, including, but not limited to, valuation, debt capacity, unencumbered asset valuation, liquidation analysis, DIP/exit financing, plan feasibility and fairness, etc.

## Plan and Disclosure Statement Preparation/Modification

- Wrote Valuation Analysis and Liquidation Analysis sections of Disclosure Statement.

- Prepared exhibits for Liquidation Analysis section and plan recoveries section of Disclosure Statement.

- Reviewed and provided edits to Plan and Disclosure Statement.

- Modify Liquidation Analysis section and/or recoveries charts, as required.

- Review and provide edits to amendments or modifications to the Plan and Disclosure Statement.

## Valuation

- Review and revise going concern valuation and liquidation valuation, if necessary, to reflect events during the pendency of the bankruptcy case.

  - Impact of North Scottsdale delay.

  - Impact of delay in the bankruptcy case.

- Review any revisions to the Debtors' business plan and the impact of such changes to value.

- Revise the trading multiples of the comparable companies to reflect new information.

- Evaluate the Debtors' ability to retain and utilize its significant tax attributes. Assessing the benefit of any such attributes on the Debtors' business plan and long-term cash flow.

## Unencumbered Asset Valuation

- Review and revise unencumbered asset valuation to reflect events during the pendency of the bankruptcy case.

## Facilitate Due Diligence for Secured Noteholder, Committee and Other Advisors

- Participated in due diligence sessions with Committee advisors and Secured Noteholder advisors. Prepared due diligence package/presentation for Committee advisors and Secured Noteholder advisors.

- Continue to facilitate the due diligence process of the Secured Noteholder, Committee and other advisors retained in the case, specifically with respect to (i) valuation, (ii) unencumbered asset valuation, (iii) debt capacity, (iv) liquidation analysis, and (v) thoughts and observations on the business plan, among others.

## Financial Analysis

- Monitor weekly/monthly financial information provided by the Debtors.

- Analyze the weekly/monthly financial statements of the Debtors, including, but not limited to, (i) external income statements, cash flow statements and balance sheets, (ii) internal financial reporting packages, (iii) monthly operating reports, and (iv) the 13-week cash flow forecast. Update valuation, liquidity, debt capacity, and other analyses to reflect information included in such statements.

## Claims Resolution

- Assist with the claim resolution process.

- Update the recovery analysis to reflect revised estimates of claims or revised valuation conclusions (going concern and/or liquidation).

## Exit Financing

- Contact other potential lenders with the opportunity of providing an exit financing facility.

- Negotiate final documentation of exit financing facility, including assessing the appropriateness of various financial covenants associated with the exit financing facility.

- Assess the debt capacity of the Debtors based on revisions to the business plan and/or financial performance during the pendency of the bankruptcy case.

## External Communication

- Advise Company with regard to press releases associated with Chapter 11 related issues or events.

- Explain to Secured Noteholders and other stakeholders on an unrestricted basis the (i) economics underlying the plan of reorganization, and (ii) trends and facts associated with the Debtors' monthly operating reports, among other things.

## Plan Alternatives

- Respond to all inquiries regarding possible Plan alternatives, including possible third-party investment and sale alternatives.

6.     If for some reason Houlihan is not employed as the Debtors' financial advisor, the Debtors would be forced to engage another, firm to provide those services – presumably on terms that would end up being substantially similar to the terms of the proposed Houlihan engagement. Consequently, denial of the Houlihan Application would impose on the estates the additional cost, delay and disruption associated with the hiring (and education) of a new financial advisor – all to no apparent end.

1        I declare under penalty of perjury under the laws of the United States of America

2    that the foregoing is true and correct.

3        Executed this 27th day of October, 2004, at Los Altos, California.

4

5                    William G. Taves

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF ANDREW B. MILLER

I, Andrew B. Miller , declare as follows:

1.    I am over eighteen years of age and, if called as a witness, I could and would testify competently to the matters set forth herein from my own personal knowledge, except as expressly noted otherwise.

2.    I am a Managing Director in the Financial Restructuring Group in the Los Angeles office of Houlihan Lokey Howard & Zukin ("Houlihan"). I helped found the Houlihan Lokey Distressed Company M&A Group, which has handled more distressed company M&A assignments than any other firm. Under my supervision, that group has consummated over 150 transactions, including in- and out-of-court restructurings, as well as distressed company mergers and acquisitions. I have been listed in the K&A Restructuring Register, which is a peer group listing of the top 100 attorneys and financial advisors who practice in the restructuring, reorganization, insolvency and bankruptcy arenas in the United States. I am ranked as one of the most active distressed company investment bankers by The Deal and the youngest person named to the Los Angeles Business Journal's Who's Who of Banking & Finance Turnaround Specialists. I have spoken on such diverse topics as Trends and Opportunities in U.S. Restructurings, Financing the Sale of a Distressed Company, Financial Restructuring in the New Economy, Distressed Company M&A—Issues and Trends, Chapter 11 Bidding Procedures & Buyer Protections, Trends in the German Distressed Debt Market, Valuation of Troubled Companies, Exit Scenarios and Financing, and Early Warning Signs and Early Lender Responses. From time to time I also lecture at the UCLA School of Law.

3.    Prior to joining Houlihan Lokey, I was a management consultant with the Boston Consulting Group and Bain & Company. I hold a J.D. from the University of Chicago Law School, an M.B.A. from the University of Chicago Graduate School of Business and a B.S. in business administration, with highest honors, from the University of California, Berkeley.

4.    The Houlihan Application requests that the Court approve Houlihan's employment in the ARG bankruptcy cases under the express provisions of Bankruptcy Code

section 328(a). Houlihan is regularly employed in bankruptcy cases under section 328(a) and (a) understands and acknowledges that its compensation will be subject to review by the Court in accordance with the standards set forth under section 328(a); and (b) will file interim and final fee applications which shall include time records describing generally the services rendered and setting forth the name of the individuals rendering such services in half-hour increments, as well as records identifying the costs and expenses (including attorneys fees) for which Houlihan will seek reimbursement pursuant to its engagement letter.

5.    The Houlihan Application requests that the Court authorize the Debtors to compensate Houlihan through a monthly fee of $125,000, plus a "back-end" Restructuring Transaction Fee of $750,000. This structure – a monthly fee coupled with a "transaction" payable when a transaction is successfully completed – is by far the most common structure used in employing financial advisors/investment bankers in distressed situations. The structure provides the professional with interim monthly compensation (such that the professional does not find itself "financing the case"), while at the same time "back-ending" a large portion of the compensation to provide proper incentive to achieve a successful transaction.

6.    Attached as Exhibit 1 to this declaration is a table summarizing 25 recent or ongoing restructurings of companies of a similar size as the Debtors. The information contained in Exhibit 1 was obtained from a combination of publicly available information, as well as from information maintained by Houlihan in the ordinary course of business in the form of a "deal database" that monitors restructurings across the country. The table indicates that in each of the 25 restructurings, the debtor (either in court or out of court): (a) engaged a financial advisor; (b) agreed to pay the financial advisor a flat monthly fee that, on average, exceeded $125,000; and (c) agreed to pay the financial advisor a transaction fee ranging from 0.4% of the total pre-restructuring debt to 2.0% of the total pre-restructuring debt. In addition, the table indicates that, in all 18 of the identified transactions that involved bankruptcy filings, employment of the financial advisor was granted under section 328(a). The information summarized in the table makes clear that the proposed engagement of Houlihan falls well within the "common business terms" of the applicable marketplace.

1        I declare under penalty of perjury under the laws of the United States of America

2   that the foregoing is true and correct.

3        Executed this 27th day of October, 2004, at Los Angeles, California.

4

5        _____
         Andrew Miller

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Houlihan Lokey Howard & Zukin

*Debtor-Side Restructuring Fee Study (SORTED BY PRE-PETITION DEBT)*

*($ in millions, unless otherwise noted)*

## DEALS WITH PRE-PETITION DEBT BETWEEN $100 MILLION AND $250 MILLION (Sorted by Pre-Petition Debt)

| Company | Financial Advisor | In-Court/Out-of-Court | Jurisdiction | Date Retained | Pre-Petition Debt | Monthly Fee | Trial? | Trial Period (Months) | Restructuring/Transaction Fee | % of Pre-Petition Debt |
|---|---|---|---|---|---|---|---|---|---|---|
| Keystone Consolidated Industries (a) | FTI Consulting | In-Court | EB-WI | 10/22/2003 | $101.0 | $200K per month | Yes | 12 | $1,250 | 1.2% |
| Project Silver | HLHZ | Out-of-Court | N/A | 3/19/2002 | $145.0 | $150K per month | N/A | 12 | $2,900 | 2.0% |
| Project Airborne | HLHZ | Out-of-Court | N/A | 6/12/2001 | $155.0 | $150K per month | N/A | 6 | $1,875 (b) | 1.2% |
| InterDent | HLHZ | In-Court | CD-CA | 1/10/2002 | $180.0 | $100K per month (c) | Yes | 12 | $1,800 | 1.0% |
| Project Abroad | HLHZ | Out-of-Court | N/A | 1/26/2004 | $185.0 | $100K per month | N/A | 12 | $2,000 | 1.1% |
| Arnab Brands | Miller Buckfire | In-Court | ND-TX | 2/29/2004 (d) | $185.0 | $100K per month | Yes | 12 | $1,500 | 0.8% |
| MTS (Tower Records) | Jefferco & Co | In-Court | DE | 3/31/2003 | $195.0 | $100K per month | Yes | 12 | $2,438 | 1.3% |
| Project Black Jack | HLHZ | Out-of-Court | N/A | 3/26/2003 | $196.0 | $150K per month (e) | N/A | 12 | $2,200 | 1.1% |
| Haynes International | Conway, Del Genio, Gries & Co. | In-Court | SD-IN | 11/21/2003 | $203.0 | $150K per month | Yes | 6 | $2,030 | 1.0% |
| Jackson Products | HLHZ | In-Court | ED-MO | 4/17/2003 | $211.0 | $150K per month | Yes | 12 | $1,750 | 0.8% |
| DDi Corp. | HLHZ | In-Court | SD-NY | 9/24/2002 | $215.0 | $125K per month | Yes | 10 | $2,300 | 1.1% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **High** | | | $200K per month | | 12.0 | $2,900 | 2.0% |
| **Low** | | | $100K per month | | 6.0 | $1,250 | 0.8% |
| **Mean** | | | $134K per month | | 10.7 | $2,064 | 1.1% |
| **Median** | | | $150K per month | | 12.0 | $2,000 | 1.1% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| American Restaurant Group, Inc. | HLHZ | In-Court | CD-CA | 7/29/2004 | $209.7 | $125K per month | Yes | 9 | $8,750 | 0.4% |

| | |
|---|---|
| % of Median | 83.3% |
| | 33.3% |
| | 75.0% |

## DEALS WITH PRE-PETITION DEBT BETWEEN $250 MILLION AND $600 MILLION (Sorted by Pre-Petition Debt)

| Company | Financial Advisor | In-Court/Out-of-Court | Jurisdiction | Date Retained | Pre-Petition Debt | Monthly Fee | Trial? | Trial Period (Months) | Restructuring/Transaction Fee | % of Pre-Petition Debt |
|---|---|---|---|---|---|---|---|---|---|---|
| Dan River | Conway, Del Genio, Gries & Co. | In-Court | ND-GA | 3/31/2004 | $265.0 | $125K per month (f) | Yes | 6 | $2,650 | 1.0% |
| American HomePatient | HLHZ | In-Court | MD-TN | 5/7/2002 | $278.0 | $125K per month | Yes | 12 | $1,500 (g) | 0.5% |
| Pacific USA Holdings | HLHZ | In-Court | ND-TX | 12/12/2002 | $360.0 | $150K per month | Yes | 12 | $1,500 | 0.4% |
| Key/Media Group | HLHZ | In-Court | DE | 8/20/2002 | $372.0 | $175K per month (h) | Yes | 9 | $1,800 | 0.5% |
| International Wire Group | Rothschild | In-Court | SD-NY | 6/1/2003 | $393.0 | $150K per month | Yes | 24 | $3,000 | 0.8% |
| FiberMark | Berenson & Co. | In-Court | VT | 3/2/2004 | $406.0 | $150K per month (i) | Yes | 12 | $2,500 | 0.6% |
| Project Prime Time | HLHZ | Out-of-Court | N/A | 5/20/2004 | $433.0 | $100K per month (j) | N/A | 12 | $4,330 | 1.0% |
| Neenah Foundry | HLHZ | In-Court | DE | 2/14/2004 | $455.0 | $175K per month | Yes | 12 | $3,000 | 0.7% |
| New World Pasta | Rothschild | In-Court | MD-PA | 3/19/2004 | $463.0 | $150K per month | Yes | 12 | $3,000 | 0.6% |
| Project PR | HLHZ | Out-of-Court | N/A | 8/15/2003 | $468.0 | $150K per month | N/A | 9 | $2,500 | 0.5% |
| Project Safe | HLHZ | Out-of-Court | N/A | 2/25/2004 | $547.0 | $175K per month (j) | N/A | 12 | $4,000 | 0.7% |
| Cornerstone Propane | Greenhill | In-Court | SD-NY | 7/23/2002 | $548.0 | $175K per month | Yes | 18 | $4,550 | 0.8% |
| Stage Stores | HLHZ | In-Court | SD-TX | 4/24/2000 | $560.0 | $150K per month | Yes | 9 | $5,600 | 1.0% |
| Galey & Lord | HLHZ | In-Court | SD-NY | 9/24/2001 | $600.0 | $175K per month | Yes | 9 | $4,500 | 0.8% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **High** | | | $175K per month | | 24.0 | $5,600 | 1.0% |
| **Low** | | | $125K per month | | 6.0 | $1,500 | 0.4% |
| **Mean** | | | $155K per month | | 12.0 | $3,174 | 0.7% |
| **Median** | | | $150K per month | | 12.0 | $3,000 | 0.7% |

**EXHIBIT 1**

## Houlihan Lokey Howard & Zukin
*Footnotes to Debtor-Side Restructuring Fee Study*

(a) Bankruptcy filing date was 2/26/2004.

(b) Range of $1.1 million to $1.25 million, depending on timing of transaction. Number represents average transaction fee.

(c) $100k per month for the first three months, $75k thereafter.

(d) Date of court approving retention. Actual engagement date not available.

(e) $150k for the first six months, $100k for the following two.

(f) Engagement subject to fees of $100k per month for work performed during "Phase 1" and fees of $150k per month during "Phase 2". Engagement is subject to partial transaction fee of $250k if engagement is terminated prior to the commencement of "Phase 2".

(g) Transaction fee increases to $1.7 million on the fourteenth month anniversary of the engagement.

(h) $200k per month for the first three months, $150k thereafter.

(i) $75k first month; $175k second/third month; and $150k thereafter.

(j) $175k per month for the first four months, $150k thereafter.